On September 5, 1925, the Illinois Coal Traffic Bureau, a voluntary organization composed of owners and operators of coal mines in all the various coal producing districts in the State of Illinois excepting the Belleville district, filed a petition with the Illinois Commerce Commission, to which a large number of common carriers engaged in the transportation of persons and property for hire by rail in intrastate commerce in the State of Illinois, and particularly in the transportation of coal in such commerce within the State, were made parties defendant, praying that an order be made commanding the carriers to establish and put in force and apply in the future for the transportation of bituminous coal between the points of origin and destinations named in the petition, in lieu of the rates and charges in effect at the time of filing the petition, such rates and charges as the commission might deem just and reasonable and non-discriminatory. The petition alleged that the members of the petitioner shipped from their mines bituminous coal in carload lots to points of delivery in that part of the Chicago switching district located in the State of Illinois, and to other points in Illinois which take the same rates as that portion of the Chicago switching district located *Page 72 
in Illinois, and are interested in the establishment of just, reasonable and non-discriminatory rates for the transportation of coal from their mines to those points of delivery; that the rates charged by the defendants for the transportation of coal from mines in Illinois to those points of delivery have materially and unduly increased since 1910, and are unjust, unreasonable and excessive and in violation of the provisions of the Public Utilities act, especially section 32; that a large portion of the coal produced by the petitioner's members is sold in the Chicago market and delivered at points of destination within the Chicago switching district and other points in Illinois taking the same rates, and is sold in direct competition with coal produced in and shipped from mines located in the States of Pennsylvania, Maryland, Virginia, West Virginia, eastern Kentucky, Tennessee and western Kentucky; that the defendants maintain rates and participate in the transportation of bituminous coal from mines located in the States named for delivery to points of destination within the Chicago switching district and other points in Illinois taking the same rates, which rates are substantially lower than those maintained by the defendants for the transportation of coal from the mines in Illinois; that the maintenance of such relatively lower rates by the defendants from the competing mines and points of shipment in the States named to the Chicago switching district and Illinois destinations having the same rate, results in an undue and unreasonable prejudice and disadvantage to the petitioner's members, and accords to the operators of coal mines in the other States, competitors of the petitioner's members, undue and unreasonable preference and advantage; that by reason of the rate adjustments complained of, the free movement of the intrastate commerce of the coal produced by the mines of petitioner's members, to the destinations involved, is seriously interfered with and retarded, with the proximate economic depression and threatened destruction of the coal *Page 73 
industry of Illinois, including that of the petitioner's members, and the consequent disastrous economic effect upon the Illinois territory in which the mines are situated, all in violation of section 38 of the Public Utilities act, and that by reason of the facts stated the petitioner's members have been and are being subjected to the payment of rates and charges for the transportation of bituminous coal from their mines in Illinois to that portion of the Chicago switching district located in Illinois and other destinations in Illinois taking the same rates, which rates were and now are unjust, unreasonable and excessive and in violation of the provisions of the statutes of the State of Illinois. A similar petition seeking like relief was filed by the Indiana Bituminous Coal Operators' Association with the Public Utilities Commission of Indiana. The petitioner also filed a petition with the Interstate Commerce Commission concerning interstate rates, and other petitions were filed by or on behalf of Illinois and Indiana operators with that commission, alleging, in substance, that the rates from Illinois and Indiana mines are unreasonable and unduly prejudicial as compared with those from mines in western Kentucky and the so-called Inner and Outer Crescents, located in Pennsylvania, Maryland, Virginia, West Virginia, eastern Kentucky and Tennessee, and praying for the establishment of reasonable and non-prejudicial rates for the future. These petitions were all heard jointly under the co-operative plan by the Interstate Commerce Commission, the Illinois Commerce Commission and the Public Service Commission of Indiana from March 23 to April 2, 1926, and an order was made by the Illinois Commerce Commission on February 29, 1928, on this petition, which was No. 15,568 on the Illinois Commerce Commission docket, reducing the rates for the intrastate transportation of bituminous coal to Chicago and points accorded the Chicago rate, five cents a ton from all producing districts in the State of Illinois except the Danville and Belleville districts. The defendants appealed *Page 74 
from this order to the circuit court of Champaign county, which affirmed the order of the commission. By agreement the record made before the Interstate Commerce Commission was made the record before the Illinois Commerce Commission.
The issue presented by the petition was whether the rate adjustments complained of gave an unreasonable preference and advantage to the competitors of the petitioner's members and subjected them to the payment of rates and charges for the transportation of coal from their mines in Illinois to that part of the Chicago switching district situated in Illinois and other destinations in Illinois taking the same rates, which were unjust, unreasonable and excessive. The commission's findings were, that there is no evidence in the record upon which the commission might determine the propriety of the differential between producing groups as they exist to-day, and there is left for determination only the propriety of the level of rates applied for the transportation of bituminous coal from various coal producing districts in the State of Illinois to Chicago and points accorded the Chicago rates; that the record is replete with evidence showing the deplorable condition of the social and business life of mining communities; that many miners and other people directly or indirectly dependent upon the coal industry are unemployed and have found it necessary to abandon their homes to seek employment in other communities; that the effect on commercial activities in the mining communities is alarming, and it is contended that the freight rate adjustment has contributed to these conditions; that the complainants do not depend solely upon these economic conditions in support of their complaint but rely mainly on the inequality of rates resulting from the higher percentage increases applied to the rates on bituminous coal intrastate in the State of Illinois compared with the percentage increases applied on rates for the transportation of bituminous coal from competing producing districts; *Page 75 
that in 1914 carriers operating within the State filed tariffs with the predecessor of the commission proposing to make effective on November 16, 1914, and various dates thereafter, an increase of 5 per cent in all rates except the rates for the transportation of bituminous coal. In these tariffs it was proposed to increase the rates for the transportation of bituminous coal 5 cents per ton instead of 5 per cent. The tariffs were suspended, a hearing was held by the commission, and an order was entered authorizing an increase of 5 per cent, with a maximum of 5 cents per ton in the rates for the transportation of bituminous coal. The freight rates for the transportation of bituminous coal applicable in Illinois were made to favor the long-haul traffic. On October 9, 1917, authority was granted by the Public Utilities Commission permitting a horizontal increase in the rates for the transportation of bituminous coal of 15 cents per ton, the effect of which was to accentuate a disparity between the long and the short-haul rates which then existed. On May 24, 1918, by an order of the Director-General of Railroads to become effective June 15, 1918, an increase of 25 per cent was made in all freight rates, applicable to practically all traffic except coal and coke, upon which an increase of rates in cents per ton was again applied. Rates 0 to 49 cents were increased 15 cents per ton; rates 50 cents to 99 cents were increased 20 cents per ton, etc. Where group rates existed the cents per ton increase to be applied was determined by the measure of the rate from the most distant groups, and that increase was applied from all the groups regardless of the measure of the then existing rate, resulting in an average increase in the coal rates of a percentage far in excess of 25 per cent. This order also favored the long-haul coal rates in the State of Illinois. Later an increase of 40 per cent was made applicable on all traffic. Prior to the increase of 40 per cent the short-haul coal rates in Illinois had been increased in amounts disproportionate to the increase *Page 76 
applied on the long-haul traffic. By increasing rates generally 40 per cent the disproportionate and excessive increases which had theretofore been applied on the short-haul coal traffic were pyramided by adding a 40 per cent increase to the then existing rates.
"Illinois coal is competitive with coal produced in western Kentucky, eastern Kentucky, West Virginia, western Pennsylvania and Ohio. Considering freight rates, prices, heating qualities and cost of handling at the furnaces, industries using Illinois coal interchangeably with coal produced in other districts have found it more economical to use coal produced in Crescent fields. The high volatile coking coal produced in the east competes with coal produced in Illinois. A large part of this eastern coal is consumed in the by-products ovens of the steel industries in the Chicago district. Coal produced in the Crescent fields for coking and other. specific purposes is generally purchased without particular regard to the differences in rates, but for all other purposes this coal is highly competitive with Illinois coal. The movement of Crescent coal for coking purposes has largely supplanted the movement of coke originally produced in beehive ovens near the mines and has not to that extent displaced Illinois coal. For other purposes, however, it has displaced to a very large extent coal produced in Illinois. The respective proportions of the aggregate movement of coal to Chicago from Illinois, Indiana, western Kentucky and the Crescents during the years 1923 to 1925 are shown below:

=================================================================
 Illinois-
Year Illinois Indiana Indiana Kentucky Crescents
-----------------------------------------------------------------
1923 45.1 12.2 57.3 1.8 40.9
1924 41.1 11.9 53.0 2.0 45.0
1925 85.0 11.2 46.2 4.2 49.6
-----------------------------------------------------------------

"Complete figures for the years previous to 1923 are not available. It is particularly since 1923 that freight rates have become an extremely important factor. During *Page 77 
the previous years post-war and strike conditions made the situation abnormal. The Crescent coal fields in the year 1919 shipped approximately 9,000,000 tons of coal to the Chicago district, while Indiana and Illinois mines jointly shipped to the Chicago district 24,500,000 tons during the same period. In 1925 the Crescent coal fields shipped to the Chicago district 15,500,000 tons, an increase of 6,500,000 tons, while Illinois and Indiana mines shipped to the Chicago district during the same period 14,333,333 tons, — a decrease of over 10,000,000 tons. This decrease in the Illinois tonnage and increase in the Crescent tonnage was subsequent to the time the greater percentage increase was applied to the rates on coal from mines in the State of Illinois than was applied to the rates on coal from the Crescent districts to destinations in Illinois.
"The following table shows the rates and average distances over short-line tariff routes from some of the principal Illinois and Indiana groups and from the Inner and Outer Crescent districts to Chicago:
=================================================================
 Average distance over Ton-Mile
 Groups short tariff routes Rate Earnings
 (miles) (mills)
-----------------------------------------------------------------
Brazil-Clinton ....... 185 $1.60 8.65
Linton-Sullivan ...... 231 1.70 7.36
Princeton ............ 277 1.77 6.39
Booneville ........... 291 1.80 6.67
Southern Illinois .... 310 1.95 6.29
Inner Crescent ....... 520 3.09 5.94
Outer Crescent ....... 595 3.29 5.53
-----------------------------------------------------------------

"The evidence shows that the Crescent mines are made up of smaller producing units and that they are generally on branch lines and independent short lines; that joint hauls over at least two or three lines are required in reaching Chicago; that the crossing of the Ohio river is expensive; that the traffic moves through several large terminals, and that over certain routes coal from the Crescents encounters rather adverse conditions south of the Ohio *Page 78 
river and in southern Indiana, which is not the case with respect to that from Illinois and Indiana mines.
"In 1918 approximately 6,500,000 tons of coal moved by rail from the Crescents to or through Chicago. In 1925 this movement had increased to about 15,400,000 tons, of which about 10,000,000 tons were consumed by Chicago by-products ovens. Indications are that a heavy tonnage moved beyond Chicago, the remainder was sold in Chicago in many instances at prices that the Illinois and Indiana operators could not meet.
"The following table shows the percentage increases that have been applied to the Illinois-Indiana coal rates and the Outer Crescent rates to Chicago:
[EDITORS' NOTE: TABLE IS ELECTRONICALLY NON-TRANSFERRABLE.]
"It will be observed that the rates from the southern Illinois group of mines to Chicago were increased since January 1, 1910, 98 per cent; from the Springfield, Illinois, group of mines to Chicago 120 per cent. This is compared with the percentage increase of but 60 per cent in the rates from the Outer Crescent group and 62 per cent from the Inner Crescent group of mines to Chicago, Illinois.
"Many of the railroads participating in the rates from the Illinois producing districts also participate in the joint through rates from the Inner and Outer Crescents to points of delivery in the Chicago switching district. The ton-mile earnings for the average short-line tariff routes from southern Illinois mines to Chicago are 6.29 mills, while the ton-mile earnings for the average short-line tariff routes from the Inner Crescent to Chicago are 5.94 mills and from the *Page 79 
Outer Crescent 5.53 mills. To say the least, it is clear upon this record that the Illinois coal operators have been unduly prejudiced by the larger percentage increase applied to the rates for the transportation of coal from mines in Illinois to Chicago, and that the Crescent operators have been unduly preferred in the application of a lower percentage increase in the rates from the Crescent districts to Chicago, Illinois.
"It is apparent that coal operators in Illinois have not maintained their relative positions in the coal business. Chicago is the principal and nearest large market for Illinois coal and for years obtained over half of its coal supply from mines in the States of Illinois and Indiana. In recent years this has been displaced by coal produced in the eastern districts and western Kentucky. The rates from the various producing groups in the State of Illinois are differentially related and are in general accord with the decision of the Interstate Commerce Commission in the Illinois Coal Cases of1920, 62 I.C.C. 741, 64 I.C.C. 751, which required restoration of the differentials which were in effect prior to the general increase of August 26, 1920. The rates, distances and ton-mile earnings from the several groups of origin in Illinois to Chicago, Illinois, are as follows:
===================================================================
 Average distance over Ton-mile
Group short tariff routes Rates earnings
 (miles) (mills)
-------------------------------------------------------------------
Northern Illinois ..... 116 $1.25 10.7
Danville .............. 135 1.57 11.4
Peoria ................ 178 (1.43 lump 8.0
 (1.36 fine 7.7
Fulton ................ 178 1.55 8.7
Springfield ........... 225 1.65 7.3
Southern Illinois ..... 340 1.95 5.8
____________________________________________________________________

"Traffic from Illinois mines requires comparatively little assembling service, as the mines are located on or near the main lines of the carriers. The transportation services *Page 80 
in the movement of coal to Chicago, Illinois, are performed over practically level terrain and under favorable operating conditions on the lines of very heavy traffic density.
"As indicative of the general trend of the movement of coal to Chicago, Illinois, our attention is directed to the fact that in the year 1923 Illinois mines shipped 45.1 per cent of the aggregate movement of coal to Chicago, Illinois, while in 1925 they shipped but 35 per cent. In 1923 the eastern districts shipped 40.9 per cent, while in 1925 they shipped 49.6 per cent. The western Kentucky districts shipped 1.8 per cent in 1923 and 4.2 per cent in 1925. What has been said with reference to Chicago is likewise true of the decrease in the tonnage from Illinois mines to the north and northwest. Since 1913 the rates assailed have been increased the following percentages: Southern Illinois 86 per cent; Belleville 90 per cent; Springfield 100 per cent; DuQuoin 90 per cent; Centralia 100 per cent; Danville 82 per cent.
"The average percentage increase greatly exceeds that which has been applied generally on all other traffic. Including the 5 per cent increase of 1915, the percentage increase applied to all traffic within the State of Illinois is approximately 65 1/3 per cent. If we were to apply that percentage increase to the rate on coal from southern Illinois to Chicago, Illinois, in effect in 1913, viz., $1.05, the present rate would be $1.73. Since 1913 the rate from the southern Illinois group to Chicago, Illinois, has been increased 86 per cent, resulting in the present rate of $1.95. The rate in effect from the Springfield group to Chicago, Illinois, in 1913 was 82 cents, and the present rate of $1.65 represents an increase of approximately 100 per cent over the rate effective in 1913. What has been said with reference to the increase applied to the rates to Chicago from the southern Illinois group and the Springfield group is true of the increase from other producing districts in the State of Illinois except the northern Illinois group and the Danville *Page 81 
group. A rate of $1.35 per ton from the Danville group to Chicago was prescribed by order of this commission following an investigation into the reasonableness per se of the said rate. The rates from Illinois mines to Chicago, Illinois, have been accorded a greater percentage increase than the increase applied on the rates from competing producing districts in the Crescent fields.
"At the time the general increases in rates were applied on traffic generally, including the increases applied on coal rates, it was recognized by the commission that the blanket application of general increases would result in some instances in excessive rates. It was contemplated that as these matters would come before the commission the resulting rates would be reviewed and an effort would be made to correct them so as to prevent the application of excessive or unjustly discriminatory rates. Such is the situation presented in this complaint. It was deemed expedient at the time to grant to the carriers increased revenues to meet increased operating costs. To do other than this would have resulted in a denial to the carriers for a long period of time, pending investigation of each and every rate, the relief to which they were entitled to meet increased operating costs.
"Due to the heavy loadings the earnings per car mile on Illinois coal transported to Chicago are much greater than those for similar distances in the same general territory on numerous lighter-loading commodities which are of greater value and more susceptible to damage. The rates assailed are in excess of the rates maintained for the transportation of crushed stone from Thornton, Illinois, for hauls of similar length to Illinois points. Using class-rate levels as a guide, the rates on coal from Illinois points to Chicago are found to be comparatively higher than the rates on coal from the eastern fields. The rate of $1.65 from the Springfield group to Chicago is compared by complainants with the rate of $1.48 1/2 from the western Kentucky group to *Page 82 
East St. Louis for a somewhat larger haul under less favorable conditions, including a movement across the Ohio river. Expensive bridge services are furnished at Henderson and Paducah, Kentucky, and Cairo, Illinois, on coal moving from western Kentucky to East St. Louis, Illinois, which do not obtain in the movement of coal from the Springfield group to Chicago. The record indicates that coal from the western Kentucky fields to East St. Louis, Illinois, is transported under the following adverse conditions compared with coal moving from Illinois mines to Chicago, Illinois: (1) Moves through a territory in which the density of traffic in general is lighter; (2) it originates in a country that is more broken and hilly; (3) it moves over routes with sharper curves and steeper grades; (4) the coal mines are smaller producing units and are less compactly grouped; (5) locomotive tonnage ratings are much less; (6) approximately one-half the traffic moves over two or more lines; while Illinois coal moves, in most instances, over a single line; (7) moves over the bridge at Henderson, which was built about twenty-five years ago at a cost of over $2,000,000; (8) the additions and betterments to this bridge have cost approximately $1,000,000; (9) the bridge is limited to 1100-ton trains, making it necessary to break up the heavy trains before they cross the river; (10) there is no river crossing necessary in the movement of coal from Illinois mines to Chicago.
"The movement of coal from the Springfield group to Chicago is in a territory where the transportation conditions are more favorable than from western Kentucky to East St. Louis. It is also shown that the rates assailed are higher than the rates maintained for the transportation of coal from western Kentucky mines to Louisville, Kentucky, the latter movement being in a higher-rated territory.
"Defendants contend there are certain conditions that tend to keep the rates to Chicago at or below a reasonable maximum level. Chicago is the greatest coal market in the *Page 83 
country and producers in all districts seek to sell there. The rates from Illinois mines to Chicago had their origin in the entry of an order by the Railroad and Warehouse Commission of Illinois, a predecessor of this commission, prescribing just and reasonable rates following an exhaustive investigation to determine the rates to which the railroads were entitled in order to provide sufficient revenue to pay all operating costs, depreciation, taxes and a fair return on investment. They were not made by giving consideration to the competitive elements which the defendants contend influence the existing rates. The present rates represent either increases by percentage or cents per ton applied to the rates prescribed in the said order of the Railroad and Warehouse Commission of Illinois. If we were to require the defendants herein to establish, in lieu of the existing rates for the transportation of bituminous coal, rates predicated upon a percentage increase of 65 1/3 per cent, which is the same percentage increase that was applied to freight rates generally in Illinois since 1913, it would materially reduce the revenues of the carriers. A slight reduction in the rates would undoubtedly increase the movement of traffic over the lines of the defendant carriers in the State of Illinois and thus increase the aggregate revenue of the carriers. However, the exact effect cannot be foretold.
"It is clear from this record that the complainants herein are entitled to some relief. The deplorable conditions existing in the mining industry in the State of Illinois, which affect a large part of the population of the State, are fully recorded. We conclude that the disproportionate percentage increase applied to the Illinois coal rates since 1913 has to a large degree detrimentally affected the movement of coal from Illinois mines to the Chicago district and to points accorded the Chicago rate. We further find that the increases applied to rates for the transportation of coal from Illinois mines to Chicago, Illinois, and points *Page 84 
accorded the Chicago rates since 1913, are execssive and unjustly discriminatory. We further find that the present rates for the intrastate transportation of bituminous coal to Chicago, Illinois, and points accorded the Chicago rates from all producing districts in the State of Illinois except the Danville and Belleville districts, are unjust, unreasonable and unjustly discriminatory to the extent that the said rates exceed the following:
 From Rate per ton
Springfield group .......................... $1.60
Centralia group ............................ 1.60
DuQuoin group .............................. 1.80
Southern Illinois group .................... 1.90
Northern Illinois group .................... 1.20
Peoria group ............................... 1.38
Fulton group ............................... 1.50."

It was therefore ordered that the appellants "accordingly, as they participate in the traffic, be and they are hereby directed to put in force, within forty-five days of the date of this order, maintain and apply in the future, rates consistent with the findings of the commission expressed herein."
The Interstate Commerce Commission on the same record found that the interstate rates to the Chicago switching district from the Danville, Brazil-Clinton and Linton-Sullivan groups are unreasonable to the extent that they exceed $1.35, $1.55 and $1.65 per net ton, respectively; that the interstate rates assailed are not otherwise unreasonable, but that the relationship between the rates from Illinois to points in Illinois, Indiana, Michigan, Wisconsin, Minnesota, North Dakota, South Dakota, Nebraska and Iowa, and from Indiana to points in Illinois and Wisconsin, on the one hand, and mines in western Kentucky on the other, results in undue prejudice to mines in Illinois and Indiana and in undue preference of mines in western Kentucky; that said undue prejudice and preference are due to the maintenance of unreasonably low rates from mines in western Kentucky and should be removed by increasing the rates from said mines in the amount of 10 cents *Page 85 
per net ton to all destinations in the States named to which the existing differential of western Kentucky over the southern Illinois group is 25 cents per net ton, and that the rates assailed were not otherwise unlawful. (Illinois-Indiana CoalCases, 128 I.C.C. 265.) A petition for a rehearing in this case was filed with the Illinois Commerce Commission on April 3, 1928, to which was attached a copy of the decision of the Interstate Commerce Commission, and stating, in addition to other grounds in support of the petition for rehearing, that appellants would offer evidence showing that the rates fixed by the Illinois Commerce Commission in its order are substantially below the level of the interstate rates from and to the same points and from the same group to interstate destinations in the Chicago group which were found not unreasonable by the Interstate Commerce Commission; that the rates fixed by the commission would result in undue, unreasonable and unjust discrimination and undue and unreasonable advantage and preference to persons in localities in intrastate commerce and undue and unreasonable advantage and preference to persons in localities in interstate commerce; but the petition for rehearing was denied.
The appellants contend that the Illinois Commission has no power to change and fix the relation between interstate and intrastate rates, to regulate interstate commerce, to find that the interstate rates on coal to Chicago unduly prefer interstate shippers, or that there is unjust discrimination between interstate and intrastate rates to Chicago, and that its order based on such findings is beyond the powers of the commission and therefore invalid.
It is, of course, true that the Illinois Commission has no power to regulate interstate commerce or to change and fix the relation between interstate and intrastate commerce rates. It is equally true that its power to regulate and fix the rates for intrastate commerce is exactly the same as that of the Interstate Commission to regulate and fix the *Page 86 
rates for interstate commerce, and neither commission is subject to any interference by the other, with the exception that the Interstate Commission has authority under the Interstate Commerce act to remove discriminations against interstate commerce, and to that end may control intrastate rates so far as necessary to remove unjust discriminations against interstate commerce resulting from the relation of interstate and intrastate rates which are reasonable in themselves. (Houston, East and West Texas Railway Co. v. UnitedStates, [Shreveport Case,] 234 U.S. 342; Simpson v. Shepard, [Minnesota Rate Cases,] 230 id. 352.) That Congress could and did vest the Interstate Commission with authority to remove an existing discrimination against interstate commerce by directing a change of an intrastate rate prescribed by State authority was decided in the Shreveport Case, supra. (AmericanExpress Co. v. South Dakota, 244 U.S. 617; Illinois CentralRailroad Co. v. Public Utilities Com. 245 id. 493.) The establishment of an interstate rate by the Interstate Commission between two points within the same State does not of itself, however, abolish an intrastate rate between the same points established by the authority of the State and does not destroy the power of the State to fix the intrastate rate. The two rates may exist at the same time and may continue until the Interstate Commission has found the intrastate rate unjustly discriminatory against interstate commerce and ordered its discontinuance. The question is for the sole determination of the Interstate Commission, and until it has been determined by that body is not a matter for the courts. Until the question is determined the Illinois Commission has authority over the intrastate rate, and may raise or lower it according to its judgment of the justice of the case. Its order does not fix the relations between interstate and intrastate rates. That can be done only by the Interstate Commission, but the intrastate rate governs intrastate traffic by intrastate carriers until the Interstate *Page 87 
Commission has acted by finding the rate discriminatory and ordering that it be changed. Many considerations enter into the process of fixing the rate, and the final result is to be determined not from the consideration of a single circumstance but from a general view of all conditions affecting the transportation, the volume of the traffic, the conditions under which it is carried, the cost of the transportation, competitive conditions with other carriers and other fields and in the markets reached, and many other circumstances.
No doubt has ever been entertained of the State's authority to regulate rates for transportation which were wholly intrastate, and in the Minnesota Rate Cases, supra, the court regarded the doctrine as fully established that the State could fix intrastate rates throughout its territory, and that the decisions recognizing and defining the State's power wholly refuted the contention that the making of such rates either places a direct burden on interstate commerce or is repugnant to the Federal constitution. In discussing the relative jurisdiction of the State and national governments over the subject of transportation it was said: "Congress did not undertake to say that the intrastate rates of interstate carriers should be reasonable or to invest its administrative agency with authority to determine their reasonableness. Neither by the original act nor by its amendment did Congress seek to establish a unified control over interstate and intrastate rates. It did not set up a standard for intrastate rates, or prescribe, or authorize the commission to prescribe, either maximum or minimum rates for intrastate traffic. It cannot be supposed that Congress sought to accomplish by indirection that which it expressly disclaimed, or attempted to override the accustomed authority of the States without the provision of a substitute. On the contrary, the fixing of reasonable rates for intrastate transportation was left where it had been found, — that is, with the States and the agencies created by the States to *Page 88 
deal with that subject. — Missouri Pacific Railway Co. v.Larabee Mills, 211 U.S. 612, 620, 621."
The jurisdiction of the Interstate Commission over intrastate freight rates does not interfere with the jurisdiction of a State commission over such rates so long as the orders of the State commission do not result in such discrimination. (Akron and Barberton Belt Railroad Co. v. Public Utilities Com.105 Ohio St. 553.) The Illinois Commission had, therefore, jurisdiction, by virtue of the statute of the State, to entertain the petition of the coal operators and to make such order as would be reasonable and just under the evidence produced. Whether the order operates as a discrimination against interstate commerce can only be determined in a proceeding before the Interstate Commission. In the MinnesotaRate Cases, supra, the court said on page 419: "The dominating purpose of the statute was to secure conformity to the prescribed standards through the examination and appreciation of the complex facts of transportation by the body created for that purpose, and, as this court has repeatedly held, it would be destructive of the system of regulation defined by the statute if the court, without the preliminary action of the commission, were to undertake to pass upon the administrative questions which the statute has primarily confided to it."
The regulation of interstate commerce and the control of intrastate commerce rates which unjustly discriminate against interstate commerce have been committed by Congress to the administrative authority of the Interstate Commission, and grievances complained of may be corrected by application to that authority but may not be supervised or corrected by the courts until the commission clothed by the statute with authority on the subject has been afforded, by a complaint made to it, the authority to assert its administrative functions. (Baltimore and Ohio Railroad Co. v. United States,215 U.S. 481; Texas and Pacific Railroad Co. v. Abilene Cotton Oil Co.
204 id. 426.) The Illinois *Page 89 
Commission had jurisdiction of the subject matter of the petition presented to it, and the right of the court to review its conclusion is therefore limited to determining whether its finding is without any foundation in the evidence or a constitutional right of the appellants has been infringed by such finding. Chicago, Milwaukee and St. Paul Railway Co. v.Public Utilities Com. 268 Ill. 49; Wabash, Chester and WesternRailroad Co. v. Commerce Com. 309 id. 412; Interstate CommerceCom. v. Union Pacific Rail-way Co. 222 U.S. 541.
The appellants contend that the order requiring the reduction in rates is predicated upon the economic conditions in the mining industry and that the Illinois Commission has no power to require a reduction in rates because of economic conditions in an industry or to offset economic disadvantages by a re-adjustment of rates; and they further contend that comparisons of the percentage increases in the rates assailed with the percentage increases made in other rates constitute no proper foundation for an order now fixing rates. Neither of these conditions may be sufficient, of itself, to authorize the change of rate ordered in this case, but each of them enters into the complex process of fixing a reasonable rate and must be given consideration, together with many other questions which affect the propriety of the rate to be established. It is true that the commission in prescribing reasonable rates may not base its decision entirely upon economic conditions affecting the industry involved or upon the protection of shippers from legitimate competition, domestic or foreign, or their right to unlimited markets, but it must give weight to all the factors bearing either on the cost or the value of the transportation service. No claim is made that the rates fixed by the commission are not compensatory, but it is claimed that their application will reduce the receipts of the railroads from coal freight in intrastate traffic $400,000 a year by the reduction of five cents a ton in the rate. In cases *Page 90 
where the change in rate has clearly been made primarily for the protection of an industry against foreign competition or other disadvantageous consequences, or for building up the country and thus producing traffic for the carriers, orders making such changes have been set aside. Southern PacificRailway Co. v. Interstate Commerce Com. 219 U.S. 433; Atchison,Topeka and Santa Fe Railway Co. v. Interstate Commerce Com.
190 Fed. 591; North Hennepin Producers Ass'n v. Chicago, Milwaukeeand St. Paul Railway Co. 160 Minn. 506.
It is argued that the record proves, without any substantial dispute, that the reason for the present conditions in the coal mining industry in Illinois and Indiana is that the supply of coal available always exceeds the demand and there is a much higher cost of mining coal in those States than in the other States from which coal is shipped. The record shows that about 30,000,000 tons of coal are moved to Chicago each year from the mines in Illinois, Indiana, western Kentucky and the Crescents; that four of the largest companies operating mines in Illinois and Indiana have an annual capacity of 47,690,000 tons, which is more than 17,000,000 tons greater than the actual tonnage of coal consumed in the Chicago district, and it is argued that with a capacity which so far exceeds the demand for coal it is not possible that these mines should work full time or during even a substantial part of their working days.
While the Illinois and Indiana coal mines have an annual capacity sufficient to supply all the coal consumed in the Chicago switching district, there are many other places in Illinois and other States to which coal is shipped from these mines, though Chicago is their greatest market. The Crescent coal used for coking is generally purchased without any particular regard to differences in rates but for all other purposes is highly competitive with Illinois coal and has displaced to a very great extent coal produced in Illinois. The proportion of coal carried to Chicago from Illinois *Page 91 
and Indiana mines in 1923 was 57.3 per cent of the aggregate receipts, and it fell in 1924 to 53 per cent and in 1925 to 46.2 per cent, while the proportion of Kentucky and Crescent coal, which was 1.8 per cent and 40.9 per cent, respectively, in 1923, rose to 2 per cent and 45 per cent in 1924 and to 4.2 and 49.6, respectively, in 1925, so that in the latter year the Kentucky and the Crescent coal mines were bringing to Chicago more than half the coal used there. The 9,000,000 tons of coal shipped from the Crescents to the Chicago district in 1919 were increased in 1925 to 15,400,000 tons, while the 24,500,000 tons shipped from the Illinois and Indiana fields had shrunk 14,333,333 tons. These figures tend to show that the rates from the Illinois and Indiana fields, in comparison with the rates maintained by their competitors, were a handicap to the industry of the Illinois and Indiana fields, and to justify the consideration of the economic condition of the coal mining industry in those fields as an element in determining the rates to be charged for the transportation of the coal.
An increase of various rates by the same percentage increases the higher rates by a greater sum than the lower, and, necessarily causing a wider spread between the rates, may, if there are considerable differences among the basic rates, result in great disparity of rates and unjust discrimination. In a case involving a coal freight rate for a haul not exceeding six miles from a mine two miles outside the Danville switching district to an industrial plant within the district, the Illinois Commission ordered the rate reduced from 58 cents a ton to 29 cents, basing its order on its finding that the transportation conditions surrounding the transportation of coal from the mine to the plant were not substantially different from the transportation conditions surrounding the transportation of coal between industries in the Danville switching district, the rate for which was 25 cents a ton, and that had the same percentages of increase and decrease which were required to be made in *Page 92 
freight rates generally been applied to coal, the rate in question would have been 29 cents instead of 58 cents. The changes in this short-haul coal rate had resulted in an increase of 262 per cent over the rate of 16 cents in force on April 14, 1927, while general freight rates in Illinois had been increased only 75 per cent. The rate of 25 cents a ton within the Danville switching district might be for a haul of 8.35 miles. It was held that the order of the commission, based upon a comparison of the percentages of increase and decrease of the rate in question with the percentages of increase and decrease generally, was not a proper foundation for an order fixing the rate, since the order must be based upon a consideration of what is a reasonable rate at the time the order is made. (Commerce Com. v. Cleveland, Cincinnati, Chicagoand St. Louis Railway Co. 320 Ill. 214.) It was not held, however, that changes of rate and comparisons of rate could not be considered in connection with existing rates, though they may not be controlling.
The rates effective in the Springfield and Southern Illinois districts in Illinois, the Linton-Sullivan and Brazil-Clinton districts in Indiana and the Inner and Outer Crescents in 1910 were, respectively, 75 cents, 98 cents, 70 cents, 80 cents, $1.90 and $2.05. The result of the various advances by percentage and cents per ton was that at the time of filing the petition with the commission those rates had been increased, respectively, to $1.65, $1.90, $1.60, $1.70, $3.09 and $3.29, an increase of 90 cents, 97 cents, 90 cents, 90 cents, $1.19 and $1.24, the respective rates per cent of increase being 120, 98, 128, 112, 62 and 60, the larger per cent in the lower rate producing in each case a less increase in cents than the less per cent on the higher rate. It does not necessarily follow that any of these rates were unfair or that none of them were unfair. It would hardly be expected, however, that a horizontal raise by a fixed percentage of rates so divergent would produce rates which would *Page 93 
be entirely equitable in relation to one another, and in determining the question whether the rates are now just and proper the increase both in percentage and in cents per ton should be taken into consideration, together with the other factors which affect the question.
The appellants contend that the finding of the commission respecting the origin of the rates from the Illinois mines to Chicago has no foundation in the evidence. The following is the finding: "The rates from Illinois mines to Chicago had their origin in the entry of an order by the Railroad and Warehouse Commission of Illinois, a predecessor of this commission, prescribing just and reasonable rates following an exhaustive investigation to determine the rates to which the railroads were entitled in order to provide sufficient revenue to pay all operating costs, depreciation, taxes and a fair return on investment. They were not made by giving consideration to the competitive elements which the defendants contend influence the existing rates." This order of the Railroad and Warehouse Commission was no part of the evidence before the commission. It was not offered, and the only references to it in the record to which our attention has been called are contained in the testimony of a witness for the appellee who stated that in 1910 there was a general increase in rates of seven cents a ton, which was suspended by the predecessor of the Illinois Commission but was permitted to become effective on interstate traffic; and a witness for the appellants who stated that in 1910 the carriers proposed a general advance of 10 cens a ton in their interstate and intrastate rates on coal from Illinois and Indiana to Chicago, and that the Railroad and Warehouse Commission, after a full investigation of the advance proposed, by its order of November 29, 1910, authorized an advance of seven cents a ton in the Illinois rates. No copy of the order was produced and no witness testified as to any part of its contents except as stated. The fact of the advance in rates was proved, *Page 94 
and nothing more. The finding of the commission that the order of the Railroad and Warehouse Commission followed an exhaustive investigation and that the rates were not made by giving consideration to the competitive elements which the appellants contend influence the existing rates is without foundation in the evidence. The appellants had no reason to suppose the commission would give the supposed investigation of its predecessor any weight in any finding of fact, and if this finding could be of controlling weight in the decision of the commission the order should be reversed because the finding is without foundation in the evidence. We do not, however, regard the finding as important. The rate was made, and whether upon a full consideration of all the elements which should have been considered or upon a consideration of some circumstances which should not have been considered the present question is not affected. This case must be decided upon present conditions, regardless of the errors, if any, in previous orders.
The appellants insist that the commission failed to consider or weigh their evidence and therefore denied them the hearing provided for in the statute. They say that the commission in its order makes no reference to any testimony offered by them, while it reviews in great detail that offered by the appellee dealing with percentage increases of rates and with the economic conditions in the mining industry, and bases its order upon this testimony. The statute requires the commission to make findings concerning the subject matter and facts inquired into and enter its order based on such findings but does not require the evidence to be recited in its order. All testimony is required to be taken down by a stenographer, and the record consists of a transcript of such testimony, together with all exhibits or copies thereof introduced in evidence and all information secured by the commission on its own initiative and considered by it in rendering its decision, and of the pleadings, *Page 95 
records and proceedings in the case. It does not follow because evidence appearing in the record was not commented upon in the order that it was not considered by the commission. The question for a judicial review of the order is whether the findings of the commission on which the order is based have substantial support in the evidence.
The appellants argue that the order is without any foundation in the evidence. Counsel for the appellants and for the appellee disagree in regard to the scope of the court's examination of the evidence for the purpose of determining the validity of the commission's order, appellants' counsel insisting that the provision of section 65 of the Public Utilities act that the commission shall make and render findings concerning the subject matter of facts inquired into and enter its order based thereon requires the commission to make findings legally sufficient to support its order, and in case they are not sufficient the court has no power to search the record for the purpose of evolving new and substantive findings of fact to support the order, while counsel for the appellee insist that the ultimate finding of fact that the rates are unjust, unreasonable and unjustly discriminatory to the extent stated in the order is the only finding necessary to be made, and the court may go into the evidence at large on that question and determine the propriety of the order from an examination of the whole record. We do not find it necessary to decide upon this difference, for in our judgment the findings of the commission are sufficient to sustain the order. In addition to its findings in regard to the economic conditions of the coal mining industry and the percentage increases in rates, the commission found that Illinois coal is competitive with coal produced in western Kentucky, eastern Kentucky, West Virginia, western Pennsylvania and Ohio; that the high volatile coking coal produced in the east competes with coal produced in Illinois. A large part of this eastern coal is consumed in the by-products ovens of the steel industries in the Chicago district. Coal *Page 96 
produced in the so-called Inner and Outer Crescent fields in Pennsylvania, Maryland, Virginia, West Virginia, eastern Kentucky and Tennessee for coking and other specific purposes is generally purchased without particular regard to the differences in rates, but for all other purposes this coal is highly competitive with Illinois coal. The movement of Crescent coal for coking purposes has largely supplanted the movement of coke originally produced in beehive ovens near the mines and has not to that extent displaced Illinois coal but for other purposes has displaced coal produced in Illinois. It is particularly since 1923 that freight rates have become an extremely important factor. During the previous years post-war and strike conditions made the situation abnormal. In 1919 the Crescent fields shipped approximately 9,000,000 tons of coal to the Chicago district, while Indiana and Illinois mines jointly shipped 24,500,000 tons. In 1925 the Crescent coal fields shipped to the Chicago district 15,500,000 tons, an increase of 6,500,000 tons, while Illinois and Indiana mines shipped to the Chicago district during the same period 14,333,333 tons, — a decrease of over 10,000,000 tons. What Illinois and Indiana lost was apparently supplanted by the consumption of coal produced in the Crescent fields. The percentage of the aggregate movement of coal to Chicago from Illinois in 1923 was 45.1, in 1924 41.1, in 1925 35.0, while from Kentucky the percentage in 1923 was 1.8, in 1924 2.0, in 1925 4.2, and from the Crescents in 1923 the percentage was 40.9, in 1924 45.0 and in 1925 49.6. The rate from the Southern Illinois district to Chicago over short tariff routes of 310 miles is $1.95 and the ton-mile earnings 6.29 mills; from the Inner Crescent to Chicago over short tariff routes of 520 miles $3.09, ton-mile earnings 5.94 mills; from the Outer Crescent over short tariff routes of 595 miles $3.229, ton-mile earnings $5.53. The Crescent mines are made up of smaller producing units, are generally on branch lines and independent short lines, joint hauls over at least two or three lines are *Page 97 
required in reaching Chicago, the crossing of the Ohio river is expensive, the traffic moves through several large terminals, and over certain routes coal from the Crescents encounters rather adverse conditions south of the Ohio river and in southern Indiana, which is not the case with respect to that from Illinois and Indiana mines. Traffic from Illinois mines requires comparatively little assembling service, as the mines are located on or near the main lines of the carrier. The transportation service in the movement of coal to Chicago is performed over practically level terrain under very favorable conditions and on lines of heavy traffic density. Due to heavier loadings the earnings per mile on Illinois coal transported to Chicago are much greater than those for similar distances in the same general territory on numerous lighter-loading commodities, which are of greater value and more susceptible to damage. The rates assailed are in excess of the rates maintained for the transportation of crushed stone from Thornton, Illinois, for hauls of similar length to Illinois points. Using class rate levels as a guide, the rates on coal from Illinois points to Chicago are found to be comparatively higher than the rates on coal from the eastern fields. The rate of $1.65 from the Springfield group to Chicago is compared with the rate of $1.48 1/2 from the western Kentucky group to East St. Louis for a somewhat larger haul under less favorable conditions, including a movement across the Ohio river, expensive bridge services at Henderson and Paducah, Kentucky, and Cairo, Illinois, on coal moving from western Kentucky to East St. Louis, Illinois, which do not obtain in the movement of coal from the Springfield group to Chicago. Coal from the western Kentucky fields to East St. Louis, Illinois, is transported under the following adverse conditions compared with coal moving from Illinois mines to Chicago: (1) Moves through a territory in which the density of traffic in general is lighter; (2) it originates in a country that is more broken and hilly; (3) it moves *Page 98 
over routes with sharper curves and steeper grades; (4) the coal mines are smaller producing units and are less compactly grouped; (5) locomotive tonnage ratings are much less; (6) approximately one-half the traffic moves over two or more lines, while Illinois coal moves, in most instances, over a single line; (7) moves over the bridge at Henderson, which was built about twenty-five years ago at a cost of over $2,000,000; (8) the additions and betterments to this bridge have cost approximately $1,000,000; (9) the bridge is limited to 1100-ton trains, making it necessary to break up the heavy trains before they cross the river; (10) there is no river crossing necessary in the movement of coal from Illinois mines to Chicago. The movement of coal from the Springfield group to Chicago is in a territory where the transportation conditions are more favorable than from western Kentucky to East St. Louis. It is also shown that the rates assailed are higher than the rates maintained for the transportation of coal from western Kentucky mines to Louisville, Kentucky, the latter movement being in a higher-rated territory. It is further found: "A slight reduction in the rates would undoubtedly increase the movement in traffic over the lines of the defendant carriers in the State of Illinois and thus increase the aggregate revenue of the carriers. However, the exact effect cannot be foretold." The order further finds: "It is clear from this record that the complainants herein are entitled to some relief. The deplorable conditions existing in the mining industry in the State of Illinois, which affect a large part of the population of the State, are fully recorded. We conclude that the disproportionate percentage increase applied to the Illinois coal rates since 1913 has to a large degree detrimentally affected the movement of coal from Illinois mines to the Chicago district and to points accorded the Chicago rate. We further find that the increases applied to rates for the transportation of coal from Illinois mines to Chicago, Illinois, *Page 99 
and points accorded the Chicago rates since 1913, are excessive and unjustly discriminatory."
The disproportionate percentage increase applied to the Illinois coal rates since 1913 is not, of itself, a sufficient reason for reducing the rates, yet if, because of it, the movement of coal from Illinois mines to the Chicago district is now detrimentally affected it shows a reason for the reduction of rates, and in connection with the other findings of the commission in the comparison of the rates allowed to the competitors of Illinois operators of coal mines and of the conditions under which the service of transportation is rendered to the Illinois mines and their competitors affecting the cost of transportation, the different rates under which the transportation is rendered and the earnings per ton-mile, sufficiently support the order of the commission reducing the Illinois interstate rates.
To attempt a discussion of all the many rates for various hauls in regard to which evidence was introduced by the respective parties would unduly prolong this already long opinion. The conditions under which the service of transportation was rendered in these cases were variant, approximating more or less closely in some cases the conditions involved in the present case and in some cases involving conditions so dissimilar as to be of little value on the issue here. Taking into consideration all the evidence on each side of the controversy, we cannot substitute our judgment for that of the commission even if our judgment were different, and it is not.
The Interstate Commission, as a result of the joint hearing on the same record, reduced the interstate rate on coal from the Brazil-Clinton group and the Linton-Sullivan group in Indiana to Chicago five cents a ton, from $1.60 and $1.70, respectively, and the interstate rate from the Danville group to Chicago 22 cents a ton, from $1.57, and found the rates from mines in Illinois and Indiana to points in Illinois, Indiana, Michigan, Wisconsin, Minnesota, North *Page 100 
Dakota, South Dakota, Nebraska and Iowa not unreasonable, but the relationship between the rates from Illinois to points in those States and from Indiana to points in Illinois and Wisconsin on the one hand and mines in western Kentucky on the other, results in undue prejudice to mines in Illinois and Indiana and in undue preference of mines in western Kentucky, and ordered the rate from western Kentucky raised 10 cents a ton.
It is claimed by the appellants that the order of the Illinois Commission would result in undue preference to receivers of coal in intrastate commerce and in unjust discrimination against interstate commerce. If so, such shippers and receivers have a plain remedy by application to the Interstate Commission. The Illinois Commission has jurisdiction of intrastate rates and may make such order in regard to them as it deems just. The order is subject to revision in proper proceedings by the Interstate Commission, but it cannot be reviewed by the courts of this State except for want of jurisdiction, for a violation of a constitutional provision, or because not having a substantial foundation in the evidence.
The order of the Interstate Commission had no effect on intrastate rates. It dealt with interstate rates, only. There was no finding that the intrastate rates from Illinois groups to Chicago unduly discriminated against interstate commerce, and there could have been none. The only finding was that the interstate rates from mines in Illinois to points in Illinois were not unreasonable. The intrastate rate was not considered or mentioned. There was no finding or claim that it was unreasonable or reasonable. Mere discrimination does not render a rate illegal and a mere difference in rate does not constitute an undue discrimination. (United States v. IllinoisCentral Railroad Co. 263 U.S. 515; Arkansas Railway Com. v.Chicago, Rock Island and Pacific Railway Co. 274 id. 597.) Not every discriminatory *Page 101 
preference and prejudice is denounced by the Commerce act. It renders unlawful only any undue or unreasonable preference or advantage, prejudice or disadvantage in rates, regulations and practice which in the opinion of the commission is unjustly discriminatory or unduly preferential or prejudicial, to which the prohibition is to be applied. Manufacturers' Railway Co. v.United States, 246 U.S. 457.
In the case before the Interstate Commerce Commission there was no issue about the intrastate rate, no relief asked in regard to it, and no inference can arise from its finding the existing rate not unreasonable that it did find the rate five cents lower unjustly discriminatory. This order can not be extended to affect the case.
The judgment of the circuit court is affirmed.
Judgment affirmed.