ATCHISON, T. & S. F. RY. CO. et al. v. INTERSTATE COMMERCE COMMISSION (UNITED STATES & A. H. FRUIT CO. et al., Interveners).

(Commerce Court.    October 5, 1911.)

No. 7.

1. CARRIERS (§ 26*)—INTERSTATE COMMERCE—POWER OF COMMISSION TO FIX RATES—SCOPE.

The authority granted to the Interstate Commerce Commission by section 15 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 (U. S. Comp. St. 1901, p. 3165), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1909, p. 1158), to prescribe just and reasonable rates when it shall be of the opinion that the rates fixed by the carrier are unreasonable, is not an absolute or arbitrary power to act on any considerations which the commission may deem best for the public, the shipper, and the carrier, but its orders must be based on transportation considerations, and, while it may give weight to all factors bearing either on the cost or the value of the transportation services, it must disregard as well the demand of the shipper for protection from legitimate competition, domestic or foreign, for unlimited markets, or for the enforcement of equitable estoppels arising from a justifiable expectation that past rates will be maintained, as the demand of the carrier for the maximum rate under which the traffic will move freely.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

2. CARRIERS (§ 26*)—ORDER OF INTERSTATE COMMERCE COMMISSION—VALIDITY—FIXING LEMON RATES FROM PACIFIC COAST.

The order of the Interstate Commerce Commission reducing the blanket rate charged by railroad companies for the carriage of lemons from California and other Pacific Coast points to points east of the Rocky Mountains from $1.15 to $1 per 100 pounds (19 Interst. Com. Comm. R. 148), is void as beyond the powers of the commission, because based primarily on the assumed authority to protect the lemon industry against foreign competition, and not on traffic considerations.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

On petition of the Atchison, Topeka & Santa Fé Railway Company and others to enjoin enforcement of an order of the Interstate Commerce Commission, the United States & Arlington Heights Fruit Company and others, interveners.    Injunction granted.

See, also, 182 Fed. 189.

For opinion and order of the Interstate Commerce Commission, see 19 Interst. Com. Comm. R. 148.

Robert Dunlap, C. W. Durbrow, and H. A. Scandrett (Gardiner Lathrop and T. J. Norton, on the brief), for petitioners.

Blackburn Esterline, Sp. Asst. Atty. Gen. (James A. Fowler, Asst. Atty. Gen., on the brief), for United States.

William E. Lamb, for Interstate Commerce Commission.

Asa F. Call, for interveners.

Before KNAPP, Presiding Judge, and ARCHBALD, HUNT, CARLAND, and MACK, Associate Judges.

MACK, Judge. The complaint made to the Interstate Commerce Commission by shippers that the car load rate of $1.15 per 100 pounds for oranges and lemons from California and other western points to the East prescribed by the railroads was unreasonably high was dismissed by the commission as to oranges, but sustained as to lemons. These rates are so-called "blanket rates," covering transportation to practically the entire territory east of the Rocky Mountains, including New England. The rate for oranges had originally been $1.25 per hundred but had been voluntarily reduced by the railroads in 1907 to $1.15, the present rate; while the rate for lemons from 1902 on had fluctuated between $1.25 and $1 per hundred, having been several times reduced to the latter figure and again advanced to the former. Except for a brief interval, it was allowed to stand at $1 per hundred from January, 1904, to November, 1909, when it was advanced to $1.15, the same as on oranges. This is the rate now complained of. By the action of the commission, the $1.15 rate on oranges was left undisturbed, but the rate on lemons was reduced to $1, the rate so fixed being conditioned on the same requirements with regard to minimum weights that had theretofore prevailed, and being extended without change to the same territory blanketed. So much of the complaint as had reference to the additional precooling and refrigerating charges was held by the commission for further advisement, and is not included in this proceeding. This case to enjoin the enforcement of the order prescribing the $1 lemon rate was begun by bill filed in the Circuit Court of the United States for the District of Kansas. It was subsequently transferred to this court, and is now up for final disposition on the bill, answers, and testimony taken.

The first and decisive ground of attack is that the order "is without the scope of the delegated authority under which it purports to have been made" (I. C. C. v. Ill. Centr. R. R. Co., 215 U. S. 452, 470, 30 Sup. Ct. 155, 54 L. Ed 280), in this: that, while in form holding the $1.15 rate unreasonable and prescribing the $1 rate as reasonable, in substance the commission did not determine the intrinsic reasonableness of either rate, but reduced the rate prescribed by the railroads in order that, and to a point at which, in its judgment, the California growers might successfully compete with their Sicilian competitors in a broader market than would otherwise be possible; in other words, that the commission acted upon the erroneous assumption that it had the power and the right, if not the duty, so to adjust railroad rates as would give to the American industry protection against foreign competition.

If complainants are right in their contention, the invalidity of the order necessarily follows. This has been clearly established by the decision rendered since the order herein was made, in Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 Sup. Ct. 288, 55 L. Ed. 283, reversing the decree of the Circuit Court and annulling an order of the commission, which had reduced a $5 lumber rate advanced from $3.10, the rate in force for over 10 years, to $3.40 and $3.65, respectively.

Chief Justice White, voicing the unanimous opinion of the Supreme Court, thus enunciated the principles which it is urged are controlling in the present case:

"The contention is that although the order made by the commission may have been couched in form which would cause it, superficially considered, to appear to be but the exercise of an authority to correct an unreasonable rate, yet if it plainly results from the record that the order of the commission was not the exercise of such an authority, but based upon the assumption by that body of the possession of a power not conferred by law, the mere form given by the commission to its action does not relieve the courts from the duty of reviewing and correcting an abuse of power. Applying these propositions, the insistence is that both in form and in substance the order of the commission is void, because it manifests that that body did not merely exert the power conferred by law to correct an unjust and unreasonable rate, but that it made the order which is complained of upon the theory that the power was possessed to set aside a just and reasonable rate lawfully fixed by a railroad whenever the commission deemed that it would be equitable to shippers in a particular district to put in force a reduced rate. That is to say, the contention is that the order entered by the commission shows on its face that that body assumed that it had power not merely to prevent the charging of unjust and unreasonable rates, but also to regulate and control the general policy of the owners of railroads as to fixing rates, and consequently that there was authority to substitute for a just and reasonable rate one which in and of itself in a legal sense might be unjust and unreasonable, if the commission was satisfied that it was a wise policy to do so, or because a railroad had so conducted itself as to be estopped in the future from being entitled to receive a just and reasonable compensation for services rendered. On the other hand, the commission in the argument at bar does not contend that it possessed the indeed abnormal and extraordinary power which the railroads thus say was exerted. * * * While it is not denied on behalf of the commission that that body may have considered the prior rate prevailing in the Willamette Valley, the period during which it had been in force, and the effect upon the business situation in the valley of a change to a higher charge, all these things, it is insisted, were not made the basis of the power exerted, but were simply taken into consideration as some of the elements proper to be considered in the ultimate exertion of the lawful power to forbid an unjust and unreasonable rate and fix a reasonable one.

"It is clear, therefore, as we have said at the outset, that the result of the contentions and concessions of the respective parties is to reduce the controversy to a single issue, which is, What was the nature and character of the order made by the commission? That is, What, in substance, was the power which the commission exerted in making the order?

"Coming to the consideration of that subject, we are of the opinion that the court below erred in not restraining the enforcement of the order complained of, because we see no escape from the conclusion that the order was void because it was made in consequence of the assumption by the commission that it possessed the extreme powers which the railroad companies insist the order plainly manifests."

After reviewing some of the testimony taken before the commission and its report, he concluded as follows:

"While it is true that the opinion of the commission may contain some sentences which, when segregated from their context, may give some support to the contention that the order was based upon a consideration merely of the intrinsic unreasonableness of the rate which was condemned, we think when the opinion is considered as a whole in the light of the condition of the record to which we have referred it clearly results that it was based upon the belief by the commission that it had the right under the law to protect the lumber interests of the Willamette Valley from the consequences which it deemed would arise from a change of the rate, even if that change was from

an unreasonably low rate which had prevailed for some time to a just and reasonable charge for the services rendered for the future."

As early as 1896, when the commission had no power to prescribe future rates, the Supreme Court said in T. & P. Ry. Co. v. I. C. C., 162, U. S. 197, at page 221, 16 Sup. Ct: 666, at page 676, 40 L. Ed. 940:

"Our reading of the act does not disclose any purpose or intention on the part of Congress to thereby re-enforce the provisions of the tariff laws. These laws differ wholly in their objects from the law to regulate commerce. Their main purpose is to collect revenues with which to meet the expenditures of the government, and those of their provisions whereby Congress seeks to so adjust rates as to protect American manufacturers and producers from competition by foreign low-priced labor operate equally in all parts of the country."

Whatever, therefore, the rights of the carriers may be to give reduced rates for the purpose of fostering a new or an established industry or for granting to it a higher measure of protection against foreign competition than Congress, through the revenue laws, has given it, no such power can lawfully be exercised by the commission.

[1] The authority granted it under section 15 of the act to regulate commerce to prescribe reasonable rates when it shall be of the opinion that the rates fixed by the carrier are unreasonable does not confer absolute or arbitrary power to act on any considerations which the commission may deem best for the public, the shipper, and the carrier. Its order must be based on transportation considerations. While it may give weight to all factors bearing either on the cost or the value of the transportation services, it must disregard as well the demand of the shipper for protection from legitimate competition, domestic or foreign, for unlimited markets, or for the enforcement of equitable estoppels arising from a justifiable expectation that past rates will be maintained, as the demand of the carrier for the maximum rate under which the traffic will move freely.

[2] An examination of the report of the commission, reproduced so far as it bears on the lemon rate, in its entirety,[1] demonstrates that

---

[1] "The world's supply of lemons is mainly produced in two localities, Sicily and southern California. In the year 1909 Sicily shipped 69,000 car loads, southern California 6,000 car loads. The United States consumed approximately 12,000 car loads, of which one-half were of foreign growth.

"The cost of producing lemons in Sicily is much less than in California. Labor enters largely into the cost of production. The laborer in the Sicilian grove receives from 40 to 60 cents per day, while in California he is paid from $1.75 to $2 per day, and the difference in wage is even greater in case of the laborer employed about the packing houses.

"A box of lemons weighs 84 pounds. To transport that box from the Sicilian grove to the dock in New York costs from 30 to 35 cents. From New York to Chicago the rate is now 40 cents per 100 pounds, or 33.6 cents per box, and this is substantially the rate which has prevailed in the past. In 1901 the rate from California to all eastern points was $1.25 per 100 pounds, or $1.05 per box. It will be seen, therefore, that both in cost of production and in cost of transportation the Sicilian grower had a great advantage in all territory east of the Missouri river, which was the main consuming territory of the United States. A protective duty of $1 per 100 pounds had been fixed upon the Sicilian lemon, but even with that assistance the American

except for two brief paragraphs suggesting grounds for lowering the lemon while maintaining the orange rate, it deals entirely with matters tending to show the need in this industry of a high-protective tariff against Sicily and, not on traffic considerations, but to compensate for the tariff insufficiencies, a low transportation rate especially to eastern territory.

grower was unable to successfully compete. In the years 1901 and 1902 California supplied but about one-fifth of the demand in the United States.

"The growers in California applied to the carriers for a rate of transportation which would enable them to meet the Sicilian lemon in eastern markets. They asked for a rate of $1 to the Middle West and of 75 cents to the Atlantic seaboard; the rate then being $1.25 to all this territory. The carriers conceded in the winter of 1902 what was termed a 'relief' rate of $1 per 100 pounds to all territory, and that rate was renewed in the winter of 1903.

"In 1903 the general freight agent of the Santa Fé lines upon the Pacific Coast wrote to his superior traffic officer upon this subject as follows: 'There is no doubt in my mind that if the California lemon growers do not see more encouragement in the future they are going to—a good many of them—let their orchards go back. It seems to me that we will have to make the rate $1 per 100 pounds apply all the year, and give the lemon growers to understand that we will continue it in effect until they secure United States markets. * * * I think we can defend the lower rate on lemons on account of the competition of foreign lemons. * * * It is up to us now to give the lemon grower a definite answer as to what he may expect for years to come.'

"In fact, in 1904 the $1 rate was made applicable for the entire year, and was continued in effect until November and December, 1909, when tariffs were filed advancing the rate to $1.15.

"The testimony in this case indicates and fairly shows that the cost of placing lemons upon the cars in California is no less, but is rather greater, to-day than in 1904. The lemon growers assert that the increase in their production has been due mainly to the lower rate of freight under which they were better able to meet Sicilian competition.

"But even with the $1 rate California has been unable to compete with Sicily upon the Atlantic seaboard. The average price received by California growers east of the Allegheny Mountains is $1 per box less than the price obtained west of the Missouri river.

"The last tariff act increased the duty on lemons from $1 to $1.50 per 100 pounds. The complainants assert and the defendants deny that this was the occasion for the increase in the freight rate.

"The average cost to the defendant of handling lemons is somewhat less than with oranges, for the reason that the average haul is shorter. As just noted, few lemons from California find a market upon the Atlantic seaboard, while practically the entire supply in territory west of the Missouri river is from that source. Oranges, upon the other hand, move in large quantities to these far eastern markets. The complainants insisted that the average haul in case of oranges was 500 miles greater than in case of lemons, and manifestly it is considerably in excess.

"The expense of moving citrus fruit under refrigeration is greater than under ventilation, since the weight of the ice is added to the load of the car, and the proportion of oranges moving under refrigeration is greater than of lemons.

"Upon the other hand, oranges load somewhat heavier than lemons, the present minimum being 27,600 pounds in case of oranges and 27,200 pounds in case of lemons.

"Upon full consideration we are of the opinion that the present lemon rate of $1.15 is unreasonable, and that the rate ought not to exceed $1 per 100 pounds, with the present minimum weight, said rate to apply to all territory to which the rate of $1.15 is made applicable by the tariff of the defendants on file."

The only transportation considerations stated by the commission as a justification for their order reducing the lemon, while refusing to reduce the orange, rate from $1.15 to $1, are: First, that the average length of haul, and therefore the average cost, is less for lemons than for oranges; and, second, that lemons are ordinarily carried under ventilation, while oranges are ordinarily carried under the more expensive refrigeration. As an offset, in part at least, the minimum car load weight prescribed for oranges is, as stated, higher than for lemons.

Inasmuch, however, as any additional cost due to refrigeration is the subject of a special refrigeration charge, it is obvious that this cannot be considered as an element in the transportation rate.

While the difference of less than 500 miles in the length of the average haul of lemons and oranges is a fair transportation factor to be considered in prescribing blanket rates for both products, it is apparent from the report that this was but a small, if not an entirely insignificant, factor in this case, especially as the increase of 50 per cent. in the protective tariff on lemons was expected by all the parties to widen the market for the California lemon growers and thus to increase the average length of the lemon haul.

As in our judgment the order is based primarily on the assumed authority to protect the industry against foreign competition, it must be held void as beyond the powers delegated to the commission. This conclusion renders it unnecessary to determine whether, under the evidence, the rate of $1 is confiscatory, or whether the commission is empowered to prescribe blanket rates either generally or subject to the limitation that the rate between the most distant points must be at least nonconfiscatory.

A permanent injunction will be granted restraining the enforcement of the order as to the rate on lemons, without prejudice to a reopening and reconsideration by the commission of the original proceedings before it or of any further complaint in respect to the $1.15 rate, now disposed of.