## GREAT NORTHERN UTILITIES CO. v. PUBLIC SERVICE COMMISSION et al.

### No. 1060.

District Court, D. Montana.

Aug. 18, 1931.

Gunn, Rasch, Hall & Gunn and E. G. Toomey, all of Helena, Mont., for plaintiff.

L. A. Foot, Atty. Gen., and F. A. Silver, of Helena, Mont., for defendants.

Before SAWTELLE, Circuit Judge, and PRAY and BOURQUIN, District Judges.

BOURQUIN, District Judge.

This case is somewhat unique in that, believe it or not, plaintiff resists defendant's order to raise its rates. But if madness seems, is method in it, the object, cut-throat competition to a finish anticipated of a rival so lost to ethics as to poach upon plaintiff's

preserves and underbid it, its attitude that, in a restricted field wherein both cannot survive, if it must perish, it will die fighting rather than by slow starvation; and that it has an inalienable right of self-preservation to lay on until the other first cries, "Hold, enough," and flees the field whether or not damned.

The issues, evidence and that appeal to the Supreme Court is certain, warrant brevity. Amongst other things the complaint is that plaintiff, in exercise of a franchise to purvey natural gas within the sometime famous city of Shelby, has a plant more than sufficient for that. limited field; that another like utility has practically duplicated the plant and successfully entices plaintiff's patrons with the lure of lower rates; that the field can support and maintain but one of the utilities and in self-preservation plaintiff necessarily further lowered rates; and that forthwith the other appealed to the commission, which held a hearing and made an order fixing both maximum and minimum rates conforming to those of plaintiff's rival. And contending the power and order are both invalid in that they deprive plaintiff (1) of its common-law right to fix its minimum rates, (2) of its like right of competition in self-preservation of its property, (3) of liberty of contract, and (4) of property without due process of law, by the Fourteenth Amendment guaranteed, plaintiff seeks injunction.

Defendants move to dismiss.

At the hearing the judges understood, and it appeared conceded that the only issues were the power of the commission to fix minimum rates and the reasonableness of its exercise. Thereupon to escape the difficulties attendant upon again assembling three judges, they suggested that the suit be submitted as on final hearing, the answer which it was again assumed, if not conceded, would raise no issue of fact, to be later filed. Counsel agreed, and the hearing proceeded to conclusion.

Subsequently it was observed that the answer thus filed included the formal "without knowledge" of plaintiff's allegation of insufficient field as aforesaid, which suffices to deny and frame the issue. And following conference between the writer and counsel, the latter stipulated the case be submitted "on the record" on "the application for an interlocutory injunction" but "not for final hearing." Without further comment it is observed that the complaint, motion, plaintiff's reports, and the commission's report of its hearing in evidence presented, suffice to

maintain the allegation of limited or insufficient field for more than one of the rival utilities occupying it; that reasonable rates will not afford fair returns to both or more than one of them.

It appears that the commission's order was followed by proceedings in the local courts which resulted in determination that the commission was vested with power to fix minimum rates, and therein was no infringement of the guaranties of either the State Constitution or the Fourteenth Amendment. See Great, etc., Co. v. Public Service Commission, 88 Mont. 180, 293 P. 294. The latter alone here involved, plaintiff elaborately argues the fundamentals, in sufficient summary that at common law utilities have power to fix minimum rates, and, however low, is no wrong; that regulation has naught to do with minimum rates or competition save to encourage the latter to reduce rates as low as possible in behalf of that public benefit which is the sole object of regulation; that these common-law rights of utilities to fix minimum rates and to compete involve liberty of contract and are property within the guaranties of the Fourteenth Amendment; that the statute authorizing the commission to fix minimum rates and the order by the commission made in circumstances rendering it unreasonable deprive plaintiff of the right, liberty, and property aforesaid, without due process of law by said amendment guaranteed; and that the fact that the United States fixes minimum rates for interstate carriers, despite the like guaranties of the Fifth Amendment, affords no support to the like power in the states in respect to intrastate utilities, for that the federal power is derived from the Commerce Clause of the Constitution to which the Fifth Amendment yields.

To the last, a sufficient answer might be U. S. v. Ry. Co., 282 U. S. 327, 51 S. Ct. 159, 163, 75 L. Ed. 359, which merely reiterates the doctrine from the beginning maintained that "the power to regulate commerce is not absolute, but is subject to the limitations and guarantees of the Constitution (Const. Amend. 5), among which are those providing that private property shall not be taken for public use without just compensation and that no person shall be deprived of life, liberty or property without due process of law." That is to say, the Commerce Clause yields to the Fifth Amendment, since the latter is the latest expression of the people's will. See Schick v. U. S., 195 U. S. 68, 24 S. Ct. 826, 49 L. Ed. 99, 1 Ann. Cas. 585.

804

It is very obvious that whatever the United States may lawfully do in respect to rates of interstate carriers, the states may do in respect to rates of intrastate utilities. For both derive the power to like extent, subject to like restrictions, from the common source, the people.

In the beginning the people had all, unlimited and absolute power. To its exercise was no barrier save their will. For purposes of administration, by the Federal Constitution in the United States they vested all power to regulate interstate carriers and therein to fix minimum rates; and by State Constitutions in the states' they vested like power in respect to' intrastate utilities.

That this power had not been exercised in respect to minimum rates during the reign of the common law imports only that for it was then no occasion. The common law did not create it, nor could it destroy it. It is an inherent right of the people, superior and prior 'to the common law. Moreover, the common law is not so conservative that it forbids anything should be done for the first time; it does not prevent growth, progress, extension of principles to apply to new subjects and conditions.

"Many things that a man might do at common law that the states may forbid." Noble Bank v. Haskell, 219 U. S. 113, 31 S. Ct. 186, 188, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; German, etc., Bank v. Kansas, 233 U. S. 411, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189.

And constitutional guaranties in their application likewise. Merrick v. N. W. Halsey & Co., 242 U. S. 587, 37 S. Ct. 227, 61 L. Ed. 498; Euclid v. Ambler Realty Co., 272 U. S. 387, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016.

All power was the people's before and despite the common law by them ordained, and it is theirs today, though to some extent by Federal and State Constitutions they have limited its exercise by themselves or their legislative bodies until said Constitutions are duly changed. So it is that both federal and state sovereignties, in exercise of these their powers of rate regulation, by the people have been alike limited, viz., by the principle of due process of law in the Fifth and Fourteenth Amendments contained.

And that principle not infringed by minimum rates fixed by the United States equally is 'not by 'the like fixed by the states.

It has been so decided wherever the issue was involved. See Great, etc., Co. v. Public Service Commission, 88 Mont. 180, 293 P. 294, and its citations; Egyptian, etc., System v. Louisville & N. Co., 321 Ill. 580, 152 N. E. 510, 512. Liberty of contract yields to the general welfare. See Union, etc., Co. v. Georgia Public Service Corporation, 248 U. S. 375, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; Dillingham's Case, 264 U. S. 374, 44 S. Ct. 362, 68 L. Ed. 742; O'Gorman's Case, 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324, 72 A. L. R. 1163.

The power existing, the necessity and purpose of its exercise, is for legislative and not judicial judgment. German, etc., Co. v. Kansas, 233 U. S. 417, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189.

Always when in issue, however, it is for the courts to determine whether the power has been legally exercised, reasonably in regulation, and not arbitrarily and abused in disregard of its limitations aforesaid. Even as constitutional laws may be administered unconstitutionally, the lawful power to regulate may be abused and result in unlawful orders.

It is believed the latter is the instant case. That a minimum rate may be fixed so high it will repel all patronage, destroy the utility's investment, and deprive it of property without due process of law, is as clear as that a maximum rate may be fixed too low for fair returns to the same unlawful end. Both would be lawful power exercised unreasonably, resulting in illegal orders subject to be judicially annulled.

The power to regulate is not the power to destroy useful and harmless enterprise, but is to protect, foster, promote, preserve, control with due regard to the present and future interests of the utility, its patrons, and the public. See Dayton, etc., Ry. v. U. S., 263 U. S. 478, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472.

Whether regulation is reasonable always depends upon circumstances. There may be, and it is assumed there are, good and valid reasons to justify fixing minimum rates, and, when the field affords room for their application with resultant fair returns to all occupying it, such rates and the order are reasonable and valid. But when the field is limited, at reasonable rates will afford fair returns to but one, and two seek to occupy it, the law of self-preservation and survival of the fittest invokes the right of competition to the last extremity; and any minimum rate and order which would prevent the struggle and condemn the rivals to the ordeal of slow starvation is unreasonable and

void. In such circumstances the state must prevent competition for patronage and not merely competition in rates.

When the state launches two upon the sea of competition, and the plank of patronage will support but one, it cannot in reason deny them the right of necessity to fight to a finish for financial life, even as may two castaways at sea battle to the death for the spar which will support but one, without any wrong to the survivor attaching.

The remedy is in the state's hands, by restricting, as many states do, the number of utilities to the need of the field. The United States thus regulates interstate carriers. It is said, however, that the plaintiff knew a rival might appear and compete, and, taking the chances, it must take the consequences.

True, that knowledge was plaintiff's, but so was the knowledge that the defendant could lawfully make none but reasonable orders. And it had a right to assume that, come the evil day of an unnecessary and destructive competitor for patronage, the defendant would fix no minimum rate or so low that it would permit exercise of the law of necessity or competition in rates to survivorship of one of them; that at least it would be left unshackled in the struggle for existence. By the knowledge aforesaid, the utility is no more estopped than it is by the knowledge that defendant may fix a maximum rate so low as to be confiscatory. Regulation is not for its own sake, but to some useful end. In its guise rights and property cannot be destroyed without compensating benefits if only to the general public. Compare Turn, etc., Co. v. Harding Glass Co., 283 U. S. 353, 51 S. Ct. 476, 75 L. Ed. 1112.

That in circumstances here the minimum rate benefits nothing is so clear, that nothing contrary has been suggested or can be conceived. And this statute, like all since the classic which imposed death on any who shed blood in the streets of Verona, is presumed to intend exception to avoid absurd and unjust consequences.

The statute valid, but not the order, plaintiff is entitled to injunction in respect to the latter only.

Decree accordingly.

PRAY, District Judge, concurs.

SAWTELLE, Circuit Judge (concurring).

At the time Judge BOURQUIN handed down the majority opinion in this case, I had decided to dissent on the ground that I regarded the order as well as the statute valid. Upon maturer reflection, however, I have reached the conclusion that the order is invalid. Under the circumstances, I deem it desirable to set forth my views in a concurring opinion.

The statement of the case, as contained in defendant's brief, seems, on the whole, to contain a fair summary of the facts, and, with minor omissions and changes, is substantially as follows:

The plaintiff, Great Northern Utilities Company, a corporation (hereinafter termed the utility), is now and since the year 1923 has been engaged in the business of furnishing and supplying natural gas to the public generally, at Shelby, Toole county, Montana, carrying on its operations within the city of Shelby under the terms of a franchise duly granted and assigned to the utility. The utility's plant or system was designed and intended and is capable of supplying natural gas for the present and future requirements of all the people of Shelby. Until this present dispute, the utility has charged for its product such rates as have been approved by the public service commission of Montana (hereinafter termed the commission).

On September 21, 1927, the commission, of its own motion, instituted an inquiry into the reasonableness of the rates charged by the utility. The rates in effect at that time commenced with a base rate of 60 cents per M cubic feet. During the progress of the investigation, the utility lowered its base rate to 50 cents per M cubic feet and made certain reductions in the lower steps. These rates were approved tentatively by the commission, but the proceeding investigating the reasonableness of the rates charged by the utility was continued by the commission, and public hearings were had thereon at Shelby on November 29, 1927, and October 1, 1928.

Before the proceedings in docket No. 991 were instituted, to wit, in January, 1927, the city council of Shelby granted a gas franchise to the Shelby Oil & Gas Company, and, by assignment, this franchise passed to the Citizens' Gas Company. During the latter part of 1928, and before any decision was rendered in docket No. 991, the Citizens' Gas Company constructed a natural gas plant or system in Shelby, and in October, 1928, entered into actual competition with the utility for the natural gas business available in Shelby. An initial tariff was filed by the Citizens' Gas Company with the commission, stating rates for natural gas service, com-

mencing with a base rate of 35 cents per M cubic feet and graduated to 22½ cents per M cubic feet for quantities in excess of 300,000 cubic feet. At the time of the entry of the Citizens' Gas Company into the Shelby field, the utility had 485 customers, but within a brief period 137 of that number ceased to purchase gas from the utility and became customers of the Citizens' Gas Company. On November 8, 1928, the utility filed a schedule of rates with the commission proposing to establish a base rate of 25 cents per M cubic feet. Before action was taken thereon, to wit, on November 19, 1928, the utility filed its "schedule 4–A sheet 2" which called for a base rate of 20 cents per M cubic feet up to 3,000 cubic feet and 15 cents per M cubic feet, for all quantities over 300,000 cubic feet. The Citizens' Gas Company filed a protest with the commission against said schedule, asserting that the rates proposed were unfair, unjust, and unreasonable. This complaint was dismissed. In the meantime, on November 30, 1928, the commission, on its own motion, in its docket No. 1028, ordered the utility to be and appear before it at Shelby on December 20, 1928, to submit evidence in support of the reasonableness and justness of the rates and charges proposed in schedule 4–A, sheet 2. Public hearing was held at the time and place scheduled. The Citizens' Gas Company and twelve customers of said company appeared before the commission and contended that the said rates proposed by the utility were not proposed in good faith. The utility also presented evidence to the commission. No evidence was introduced tending to show the utility's probable operating revenues and expenses under the proposed schedule. The utility asserted that the rates contained in schedule 4–A, sheet 2, were not reasonable rates from its standpoint, but were justified under the competitive conditions existing at Shelby. It further stated that, in the event the Citizens' Gas Company would meet the rates proposed in schedule 4–A, sheet 2, the utility would propose further reductions.

On January 22, 1929, the commission issued its report and order No. 1530 covering both dockets—991 and 1028. Its finding in docket No. 1028 was that the rates contained in schedule 4–A, sheet 2, would not yield enough revenue to defray normal operating expenses, including a fair allowance for depreciation under conditions existing at Shelby, nor would they provide sufficient income to cover normal operating costs if conditions were the same as they had been during the calendar year 1927, when the utility

sold more natural gas than it had during any year since its entry into the utility field, a time when it had no competitor. The commission further found that, because the schedule of rates proposed would not defray normal operating expenses, the establishment of the same would tend to imperil or impair the ability of the utility to render dependable adequate service to the public, and that it would tend to prevent the utility from discharging its primary duty properly to maintain its plant and equipment to the end that it would be able to render adequate service to the residents of the territory it professed to serve; and the commission further found that, by reason thereof, the proposed schedule was contrary to the public interest and therefore unjust and unreasonable. The commission refused to concur in the proposed schedule 4–A, sheet 2.

In docket No. 991 the commission found that the rates that were in effect at the time the inquiry was commenced and the rates that were approved tentatively, pending investigation, were and are unjust and unreasonable. Upon the evidence before it, the commission made a finding that a schedule of "just and reasonable rates" for application by the utility at Shelby should commence with a base rate of 35 cents per M cubic feet for the first 10,000 cubic feet and graduate to 22½ cents per M cubic feet for all over 300,000 cubic feet. The utility was ordered to establish the schedule found just and reasonable on or before February 1, 1929.

On February 8, 1929, the utility commenced an action in the district court of the First judicial district of the state of Montana, Lewis and Clark county, for the cancellation of the order as illegal. (This statement as to the date of commencement of the action in the state court is not a part of the record before this court, but will be found in State ex rel. Public Service Commission v. Great Northern Utilities Company, 86 Mont. 442, 444, 445, 284 P. 772, of which this court will take judicial notice.) The utility was awarded a judgment on the pleadings against the commission, and a decree entered declaring the order null and void and enjoining its enforcement. An appeal was prosecuted by the commission to the Supreme Court of the state of Montana, where the judgment of the lower court was reversed and the cause remanded for further proceedings. Great Northern Utilities Co. v. Public Service Commission, 88 Mont. 180, 293 P. 294. Subsequently, a petition for rehearing was denied. 88 Mont. 232, 293 P.

294. This action was then commenced by the utility, thus creating the situation whereby it was prosecuting concurrently in the state and federal courts an action to have the order of the commission declared invalid. Upon the case in the state court being set down for trial at the instance of the commission, the utility took a voluntary dismissal of the state case. There was, therefore, no final judgment entered in the state case.

The Montana statute (Rev. Codes 1921, § 3891) gives the public service commission authority to fix minimum as well as maximum rates: "3891. * * * Provided, however, that no advance or reduction of existing schedules shall be made without the concurrence of the commission."

Such a statute is not violative of the Fourteenth Amendment of the Constitution of the United States. In Dayton-Goose Creek Railway Company v. United States et al., 263 U. S. 456, 478–479, 44 S. Ct. 169, 172, 68 L. Ed. 388, 33 A. L. R. 472, Mr. Chief Justice Taft said: "It was insisted in the two cases referred to, and it is insisted here, that the power to regulate interstate commerce is limited to the fixing of reasonable rates and the prevention of those which are discriminatory, and that when these objects are attained, the power of regulation is exhausted. This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety. The Daniel Ball, 10 Wall. 557, 564, 19 L. Ed. 999; County of Mobile v. Kimball, 102 U. S. 691, 696, 697, 26 L. Ed. 238; California v. Pacific R. R. Co., 127 U. S. 1, 39, 8 S. Ct. 1073, 32 L. Ed. 150; Wilson v. Shaw, 204 U. S. 24, 33, 27 S. Ct. 233, 51 L. Ed. 351; Second Employers' Liability Cases, 223 U. S. 1, 47, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; Luxton v. North River Bridge Co., 153 U. S. 525, 529, 14 S. Ct. 891, 38 L. Ed. 808."

Again, in United States et al. v. Illinois Central R. R. Co. et al., 263 U. S. 515, 525, 44 S. Ct. 189, 193, 68 L. Ed. 417, the court said: "For now the interests of the individual carrier must yield in many respects to the public need, Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; and the newly conferred power to grant relief against rates unreasonably low may afford protection against injurious rate policies of a competitor, which were theretofore uncontrollable."

It is conceded that the Interstate Commerce Commission has power to prescribe minimum rates by virtue of the Transportation Act of 1920 (41 Stat. 456). The plaintiff, however, argues strenuously that "the power of a state to prescribe minimum rates cannot be measured or determined by the power of Congress to prescribe rates in exercising the power to regulate commerce." This, it is contended, is because "the Fourteenth Amendment is a limitation of the powers of all the departments of the state government," while "the Fifth Amendment in no manner affected the powers granted Congress by the Constitution." Yet the very case most heavily relied upon by the plaintiff, Munn v. Illinois, 94 U. S. 113, 123–124, 24 L. Ed. 77, does not sustain this view. In discussing the "due process of law" clause of the Fourteenth Amendment, Mr. Chief Justice Waite said: "While this provision of the amendment is new in the Constitution of the United States, as a limitation upon the powers of the States, it is old as a principle of civilized government. It is found in Magna Charta, and, in substance if not in form, in nearly or quite all the constitutions that have been from time to time adopted by the several States of the Union. *By the Fifth Amendment, it was introduced into the Constitution of the United States as a limitation upon the powers of the national government,* and by the Fourteenth, as a guaranty against any encroachment upon an acknowledged right of citizenship by the legislatures of the States." (Italics our own.)

Without pursuing this academic discussion farther, it will be sufficient to quote the language of the Supreme Court in Twining v. New Jersey, 211 U. S. 78, 100–101, 29 S. Ct. 14, 20, 53 L. Ed. 97, with reference to "due process of law": "Of course, the part of the Constitution then before the court was the 5th Amendment. If any different meaning of the same words, as they are used in the 14th Amendment, can be conceived, none has yet appeared in judicial decision."

As we have seen, the Montana statute in question specifically gives the commission the power to fix a minimum as well as a maximum rate. But even were such provision lacking, there are numerous authorities that hold, and soundly, that the power to fix a rate implies the power to make that rate both the minimum and the maximum.

In Mapleton v. Iowa Public Service Co., 209 Iowa, 400, 223 N. W. 476, 479, 68 A. L. R. 993, the Supreme Court of Iowa said: "In order to sustain the defendant's position, it would be necessary to add qualification to the terms of the statute to the effect that the rate fixed is a maximum one only. There can be no legitimate construction of the statute to that effect, unless it be necessary to save its constitutionality. Such necessity is not present."

In another decision by the same court, we find the same doctrine expounded:

"By express provision, the Legislature has delegated the right to regulate and fix the rents or rates that may be charged. In this is involved the right to fix a maximum and a minimum rate." Tipton v. Tipton Light & Heating Co., 176 Iowa, 224, 157 N. W. 844, 845.

The Supreme Court of California has repeatedly expressed the same view. We find the following language in the case of Pinney & Boyle Co. v. Los Angeles Gas & Electric Corporation, 168 Cal. 12, 15, 141 P. 620, 621, L. R. A. 1915C, 282, Ann. Cas. 1915D, 471: "Appellant asserts, however, that the only reasonable use of the police power in the matter of rate-fixing is to establish the maximum charge which the public utility may make, leaving it open to the public utility by agreement to fix a less charge for an individual consumer. The untenableness of this position, however, must become apparent when a moment's consideration is given. * * *"

Another decision handed down by the same tribunal a few months later voiced the same view: "By section 19 of article 11 of the Constitution, any municipal corporation is given authority to 'regulate the charges' for gas sold by any public service corporation or any individual engaged in similar business, and among the enumerated powers of the city in its charter (Stats. 1911, p. 2063) is that 'to fix and determine rates of compensation to be collected * *. * for gas.' The authority conferred is plenary, and by the terms of the Constitution and the charter does not limit the city to the establishing of a maximum rate. Respondent insists, however, that the city's power is merely to declare a maximum rate, and that the corporation may do anything it desires in the way of a reduction of price to a general class of consumers. We cannot agree with this contention. One of the purposes of regulation is to exclude favoritism to an individual or a class. If the legislative body of a city might only fix a maximum rate, it might be possible for a corporation to reduce its charges, in some form or another, to a point which would drive a competitor out of business and, after accomplishing that result, to resume the maximum charge permitted by law." Economic Gas Company v. Los Angeles, 168 Cal. 448, 450, 143 P. 717, 718, Ann. Cas. 1916A, 931.

The Court of Civil Appeals of Texas, in Community Natural Gas Co. v. Natural Gas & Fuel Co., 34 S. W. (2d) 900, 902, decided on November 26, 1930, said: "The word 'regulate' cannot be construed as limiting the power granted to maximum rates. * * * Wherever the question has arisen, this power has been construed as extending, not only to the fixing of maximum, but also of absolute rates."

Mr. Chief Justice Hughes, in the Minnesota Rate Case, 230 U. S. 352, 420–421, 33 S. Ct. 729, 749, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, strongly implied that he concurred in the views expressed in the decisions quoted above, as to the general power of the states to fix minimum rates: "Neither by the original act nor by its amendment did Congress seek to establish a unified control over interstate and intrastate rates; it did not set up a standard for interstate rates, or prescribe, or authorize the commission to prescribe, *either maximum or minimum rates for intrastate traffic.* * * * On the contrary, the fixing of reasonable rates for intrastate transportation was left where it had been found; that is, with the states and the agencies created by the states to deal with that subject."

Finally, the Supreme Court of Montana (88 Mont. 180, 293 P. 294, 305), in considering the instant case, not only held that the Commission "is empowered to fix precise rates," but also expressed the view that the statute is "not offensive to the Constitution of the state of Montana" or to the Fourteenth Amendment of the Federal Constitution. While the decision of a state court on a federal question is concededly not binding upon this court, it is persuasive—particularly when it is only one of many decisions to the same effect handed down by highest state tribunals.

We believe it to be well settled, therefore, that a state or its agencies have the power to fix minimum as well as maximum rates—either specifically as to each, or by prescribing a "precise" or "absolute" rate. That such power is grounded upon sound public policy is evident when it is remembered that, as Mr. Chief Justice Taft observed in the

Dayton-Goose Creek Railway Company Case, supra: "To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety."

If a public utility company is permitted to drive out its competitors by establishing cut-throat rates, when competition is destroyed, it can plausibly come before the commission and ask to be permitted to charge higher rates, on the ground that its rates at any given time are insufficient to bring a fair return on the present fair valuation of its property. As was well said in the Mapleton Case, supra:

"A public utility, operating under a franchise, has no constitutional right of *competition*. Moreover, a rate war is not necessarily competition. It may be, and usually is, a mere fight, which bodes nothing to the public but disorder and disorganization."

This brings us to the second question in the instant case: Must the precise rate fixed by the commission, partaking as it does of the nature of both a maximum and a minimum rate, allow the public utility company a fair return upon a fair value of the company's property?

The Supreme Court has answered this question repeatedly and unequivocally in the affirmative.

In the Minnesota Rate Case, supra, Mr. Chief Justice Hughes lucidly stated the principle involved:

"The property of the railroad corporation has been devoted to a public use. There is always the obligation springing from the nature of the business in which it is engaged—which private exigency may not be permitted to ignore—that there shall not be an exorbitant charge for the service rendered. But the state has not seen fit to undertake the service itself; and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection which extends not merely to the title, but to the right to receive just compensation for the service given to the public. Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 6 S. Ct. 334, 388, 1191, 29 L. Ed. 636; Georgia Banking Co. v. Smith, 128 U. S. 174, 179, 9 S. Ct. 47, 32 L. Ed. 377, 380; Chicago, etc., Ry. Co. v. Minnesota, 134 U. S. 418, 10 S. Ct. 462, 702, 33 L. Ed. 970; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L.

Ed. 1014; St. Louis & S. F. Ry. Co. v. Gill, 156 U. S. 649, 652, 667, 15 S. Ct. 484, 491, 37 L. Ed. 567, 568, 573; Covington, etc., Turnpike Road Co. v. Sandford, 164 U. S. 578, 596, 597, 17 S. Ct. 198, 41 L. Ed. 560, 566, 567; Smyth v. Ames, 169 U. S. 466, 546, 547, 18 S. Ct. 418, 42 L. Ed. 819; San Diego Land & Town Co. v. National City, 174 U. S. 739, 754, 19 S. Ct. 804, 43 L. Ed. 1154, 1160; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 446, 23 S. Ct. 571, 47 L. Ed. 892, 896; Stanislaus County v. San Joaquin Co., 192 U. S. 201, 215, 24 S. Ct. 241, 48 L. Ed. 406, 408; Knoxville v. Knoxville Water Co., 212 U. S. 1, 17, 29 S. Ct. 148, 53 L. Ed. 371, 381; Willcox v. Consolidated Gas Co., 212 U. S. 19, 41, 29 S. Ct. 192, 53 L. Ed. 382, 395, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

"In determining whether that right has been denied, each case must rest upon its special facts. But the general principles which are applicable in a case of this character have been set forth in the decisions.

"(1) The basis of calculation is the 'fair value of the property' used for the convenience of the public. Smyth v. Ames, 169 U. S. 546, 18 S. Ct. 418, 42 L. Ed. 849. Or, as it was put in San Diego Land & Town Co. v. National City, 174 U. S. 757, 19 S. Ct. 804, 43 L. Ed. 1161: 'What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.' See also San Diego Land & Town Co. v. Jasper, supra; Willcox v. Consolidated Gas Co., supra."

In more recent cases, the same doctrine has been consistently applied. In Bluefield, etc., Co. v. Public Service Commission, etc., et al., 262 U. S. 679, 692, 43 S. Ct. 675, 679, 67 L. Ed. 1176, the court even expanded the rule: "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public *equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties.*" (Italics our own.) Again: "But in determining present value, consideration must be given to prices and wages prevailing at the time of the investigation; and, in the light of all the circumstances, there must be an honest and intelligent forecast as to probable price and wage levels **during a reasonable period in**

the immediate future. In every confiscation case, the future as well as the present must be regarded. It must be determined whether the rates complained of are yielding and will yield, over and above the amounts required to pay taxes and proper operating charges, a sum sufficient to constitute just compensation for the use of the property employed to furnish the service; that is, a reasonable rate of return on the value of the property at the time of the investigation and for a reasonable time in the immediate future. S. W. Tel. Co. v. Pub. Serv. Comm., 262 U. S. 276, 287, 288, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 692, 43 S. Ct. 675, 67 L. Ed. 1176. Cf. Board of Utility Commissioners v. New York Telephone Co., 271 U. S. 23, 31, 46 S. Ct. 363, 70 L. Ed. 808." McCardle et al. v. Indianapolis Water Co., 272 U. S. 400, 408, 409, 47 S. Ct. 144, 147, 71 L. Ed. 316. See, also, United Fuel Gas Company et al. v. Railroad Commission of Kentucky et al., 278 U. S. 300, 310, 49 S. Ct. 150, 73 L. Ed. 390; Banton v. Belt Line Railway Corp., 268 U. S. 413, 421, 422, 45 S. Ct. 534, 69 L. Ed. 1020; Dayton-Goose Creek Railway Case, supra, at pages 480 and 481 of 263 U. S., 44 S. Ct. 169; Smith et al. v. Illinois Bell Telephone Co., 282 U. S. 133, 160–161, 51 S. Ct. 65, 75 L. Ed. 255.

In its order, the commission asserts that there is a "limitation" upon the rule that a public service company is entitled to a fair rate upon the present fair value of its property used in the public service. This limitation, according to the commission, is "that a utility will never be permitted to charge more than the worth or value of the service which it is rendering." Surely, however, an important element—if not the controlling one—in ascertaining "worth" is the "cost" of the service rendered. It is true that allowance should not be made for expenditures that are clearly extravagant; but, if the business is prudently, carefully, and economically conducted, we know of no "limitation" upon the "fair return" rule. The commission cites a number of cases in support of its contention; but an examination of the Supreme Court decisions, at least, will disclose that, as a matter of fact, most of them do not sustain the commission's view. For example, Mr. Chief Justice Hughes, in the Minnesota Rate Case, supra, cited by the commission as "Simpson v. Shep[h]ard," clearly insisted upon the application of the "fair return" rule in that case.

It is in that case, indeed, as we have seen, that the "fair return" rule is quite elaborately expounded. And the general trend of the many decisions on the subject is definitely against any relaxation of the "fair return" rule, once a case is shown to come clearly under it.

Nor can the doctrine of estoppel be invoked against a carrier, on the ground that it has accepted or asked for an even lower rate than that fixed by the state or its agency. In Southern Pacific Company v. Interstate Commerce Commission, 219 U. S. 433, 443–444, 31 S. Ct. 288, 291, 55 L. Ed. 283, Mr. Chief Justice White said: "That is to say, the contention is that the order entered by the Commission shows on its face that that body assumed that it had power not merely to prevent the charging of unjust and unreasonable rates, but also to regulate and control the general policy of the owners of railroads as to fixing rates, and consequently that there was authority to substitute for a just and reasonable rate one which, in and of itself, in a legal sense, might be unjust and unreasonable, if the Commission was satisfied that it was a wise policy to do so, *or because a railroad had so conducted itself as to be estopped in the future from being entitled to receive a just and reasonable compensation for the service rendered.* * * * We see no escape from the conclusion that the order was void because it was made in consequence of the assumption by the Commission that it possessed the extreme powers which the railroad companies insist the order plainly manifests."

As was observed by Mr. Justice Lamar in Interstate Commerce Commission v. Union Pacific Railroad Company, 222 U. S. 541, 553, 32 S. Ct. 108, 113, 56 L. Ed. 308: "It is quite true that the carriers may do what they could not be compelled to do." In this connection, see, also, Atchison, T. & S. F. Ry. Co. et al. v. Interstate Commerce Commission (Com. Ct.) 190 F. 591, 592–594, in which the Southern Pacific Case, supra, is followed; Atlantic Coast Line R. Co. v. Trammell et al. (D. C.) 287 F. 741, 744; Great Falls Gas Co. v. Public Service Commission of Montana et al. (D. C.) 34 F.(2d) 297, 298.

We come now to the final question: Did the commission's order in the instant case give the plaintiff company "a fair return upon a fair value" of its property?

We need not search far for the answer. It is lodged in the "Report and Order" of

the commission, which is attached to, and, by paragraph XIX, is made part of the bill of complaint.

On page 24 of the report we find the following language: "Were we to attempt to apply the principle of a fair return upon a fair value in this case, we would arrive at a manifestly exorbitant rate." In view of this and similar language found in it, the order of the commission stands self-condemned as violative of the Fourteenth Amendment of the Constitution of the United States. The commission utters a strange paradox when it says, all in the same breath, that a "fair" rate will be "exorbitant"!

The defendant commission contends that the plaintiff is not in position to urge the question of confiscation because the complaint does not present the issue, and, secondly, because there is no evidence as to the present fair value, fair rate, etc. The complaint, however, in paragraph XX, does specifically invoke the due process of law clause of the Fourteenth Amendment; and the order, on its face, shows that the "fair return" rule was consciously and deliberately disregarded by the commission. There is, consequently, no need of further evidence on the subject. The report itself is the best evidence.

A public service commission has the power, under the Federal Constitution, to fix a precise rate that will mark both the maximum and the minimum range of a public utility's rates. But, when a commission undertakes to do this, it must see to it that the rate thus fixed will give to the utility company "a fair return upon a fair value" of the company's property.

Since the commission in the instant case avowedly did not do this, I concur in the decree granting an injunction to prevent the commission from putting the order complained of into effect.