## CITY OF FARMERSVILLE v. TEXAS–LOUISIANA POWER CO. et al.
### No. 11342.

Court of Civil Appeals of Texas. Dallas.
Oct. 29, 1932.

Rehearing Denied Dec. 10, 1932.

196

Touchstone, Wight, Gormley & Price and J. W. Gormley, all of Dallas, for appellant.

W. R. Abernathy and W. P. Abernathy, both of McKinney, and Bennett L. Smith, of Ft. Worth, for appellees.

LOONEY, J.

This controversy reached us first on appeal from an order of the trial court dissolving a temporary injunction [see City of Farmersville v. Texas-Louisiana Power Co. (Tex. Civ. App.) 33 S.W.(2d) page 272]; we refer to and adopt the statement of the case there given. As there shown, on May 5, 1930, appellant adopted two ordinances (Nos. 122 and 123); the purpose being to regulate utilities and fix rates to be charged consumers. These ordinances were enacted under authority of article 1119, Revised Statutes, as it then existed; later, however, the Forty-Second Legislature amended the article by an Act approved May 26, 1931, effective ninety days after adjournment (see Session Acts, c. 226 p. 380 [Vernon's Ann. Civ. St. art. 1119]) in these respects: Authorizing cities and towns of over 500 population, instead of over 2,000 as formerly provided, to regulate and prescribe rates to be charged by public utilities; providing that no rates should be fixed that would yield more than 10 per cent. per annum, in lieu of the former provision, of not less than 10 per cent. per annum, on the actual cost of the physical properties, equipment, and betterments.

After the amending statute became effective, appellant, on September 1, 1931, adopted Ordinances Nos. 126 and 127 in all material respects the same as Ordinances Nos. 122 and 123, in which rates for its own observance were prescribed, as well as for the observance of appellee, being the same, in effect, formerly voluntarily charged by appellee. Appellee, refusing to abide by the schedule prescribed by the ordinance, promulgated, and insists upon maintaining, a schedule of rates much lower, all of which is revealed by the findings of the court hereinafter set out.

The case was tried without a jury on appellant's fifth amended petition, which differs from its original petition as set out in the report on former appeal, in several material respects. We notice the following: In the amendment, appellant specially pleaded the ordinances enacted under amended article 1119; and, as a last recourse, if denied the legal remedy sought, that it be accorded injunctive relief in the premises under general principles of equity.

As the case is, in some respects, a pioneer, we are giving a lengthy and somewhat tedious statement.

Appellee urged, and the court sustained, a special exception to the allegations of the amended petition setting up and relying upon the rate and regulatory ordinances adopted in September, 1931, by authority of amended article 1119, on the theory that said amendment was unconstitutional because of a captional defect; other issues framed by the pleadings are revealed by the conclusions of the trial judge, the material portions of which we adopt as our own, except however, the conclusions that are obviously speculative.

The court found that on August 9, 1899, the city of Farmersville, by ordinance, granted a franchise authorizing the Farmersville Milling Company and its successors, etc., to maintain and operate within said city an electric light plant for a period of fifty years, granting, in this connection, the use of the streets, alleys, and other public highways of the city for such purposes; that thereafter the Farmersville Mill & Light Company acquired all rights of the Farmersville Milling Company, under said grant, and in the year 1926 the Kentucky-Central Company acquired from the Farmersville Mill & Light Company its rights under said franchise and properties, except its power plant, and thereunder the Kentucky-Central Company furnished electricity to said city and its citizens until defendant (appellee) in 1927, acquired said assets, including the distributing system, franchise rights, and privileges of the Kentucky-Central Company, and has since furnished to the city of Farmersville and its inhabitants electricity, as provided under the franchise; that from some date in 1927 to some date in 1928, appellee furnished electric power under a schedule of rates that allowed no discount for prompt payment, and provided a minimum rate of $1.50 per month; that a slight change was made in 1928 merely affecting commercial customers; the rates then charged by the power company were as follows: Monthly residence rates: 15 cents per kw. for the first 20 kw.; 10 cents per kw. for all energy consumed in excess of 20 kw. Monthly business rates: 15 cents per kw. for first 20 kw.; 12½ cents per kw. for second 20 kw.; 10 cents per kw. for third 20 kw.; 7½ cents per kw. for next 200 kw.; 4 cents per kw. for all energy consumed in excess of 260 kw.—with a minimum rate of $1.50 per month. These rates remained in force until March 1, 1930, about three weeks after the city plant began operation, at which time appellee promulgated an entirely new schedule materially lowering rates to consumers, and is still maintaining said lowered rates. During the year 1929, the city of Farmersville, through its governing body, availed itself of the rights accorded cities and towns in this state to purchase and install its own electric light plant; electric machinery was purchased on time payments under the provisions of the statute authorizing such pur-

chase, and, in respect to the purchase, installation, and operation of its electric light plant, the city conformed to the provisions of the statutes. (The court here sets out the contract entered into for the purchase and installation of the city's plant, which we do not deem material in this connection.) The plant established by the city began operation in February, 1930, at which time the city adopted the schedule of rates then being charged by the power company, appellee, except the city gave 10 per cent. discount for prompt payments, and reduced the minimum rate from $1.50 to $1.25 per month. (The court in paragraph 7 made findings with reference to special contracts with certain business houses, providing for the installation of lights under awnings in front of business places, not deemed material in this connection.) The findings include these further facts that, at and prior to the time of the completion and operation of the city's plant, the city had secured promises from 225 patrons of the power company to quit it and become customers of the city when its plant began operation. The power company had 450 customers at the time the municipal plant began operation in the early part of February, 1930; about three weeks later 280 of its customers discontinued and became customers of the municipal plant. At this point the court makes a specific finding to the effect that, if the power company had not reduced its rates, the municipal authorities would have secured all of the 450 customers in another three weeks' time except about 10 per cent. When the customers of the power company were reduced to 170, appellee, on March 1, 1930, adopted and promulgated its new schedule of rates; that is, they charged only 5 cents for the first 20 kw. and 3 cents for all over that amount, and it has maintained this schedule of rates since said time, with the result that loss of customers ceased.

In paragraph 9, the following deductions are stated: "I find that the power company reduced its rates as above on March 1, 1930, in good faith solely for the purpose of preventing a loss and confiscation of the property and investments in the city and did not make and maintain such reduced rates for the purpose of putting the city plant out of business nor for the purpose of securing a monopoly in the lighting business." We cannot assent to the above as being a reasonable deduction from the facts; on the contrary, think that in this, as well as in all such instances, the presumption should be indulged that appellee intended the natural and immediate results of the voluntary action taken, and, as applied to the instant case, we deduce the fact that it was the intent and purpose of appellee in reducing its rates to put the city plant out of business, with the view of ultimately securing a monopoly of the lighting business at Farmersville.

The court further found that, after the power company reduced its rates to the 5 cents and 3 cents, the governing body of the city, on April 24, 1930, enacted a general regulatory utilities ordinance, and on May 5, 1930, enacted an ordinance prescribing certain rates to be charged consumers, being the same then being charged by the municipal plant. The court also found that, on and for some time prior to the passage of said ordinances, the city of Farmersville had a population of only 1,878, and since has not had a population of 2,000 or over; that at the time of the consideration and passage of these ordinances (Nos. 122, 123), the mayor and city council were in possession of information which, if pursued, would have apprised them of the fact that Farmersville did not have a population of 2,000; that said officials made no investigation, no evidence was introduced, and no finding was made, except as shown on the face of the ordinance. We think the evidence justified the conclusion that, at the time of the passage of Ordinance No. 123 (May 5, 1930), fixing the rates to be charged by electric utilities in the city of Farmersville, members of the governing body knew that the actual count (1930 United States census) showed that the city of Farmersville had a population of only 1,878. The findings in paragraph 11 we do not regard material.

In paragraph 12 the court found that the city, acting under amended article 1119, ascertained that Farmersville had a population of over 500 inhabitants, and in June (8 and 9), 1931, adopted Ordinances Nos. 124 and 125, same as Nos. 122 and 123, regulating utilities and prescribing rates, etc.; however, as these were adopted before the amendment became effective, the governing body, on September 1, 1931, adopted Ordinance No. 126, a regulatory ordinance similar to the former regulatory ordinances, and on September 11, 1931, adopted Ordinance No. 127, fixing the rates to be charged by utilities furnishing electricity to the city, the same as were prescribed in Ordinance No. 123 adopted May 5, 1930, being the same rates adopted and put into effect by the city when it began operation in February, 1930.

In paragraph 13 the court said: "I further find that the governing body of the City of Farmersville, in adopting and enacting each and all of said ordinances, setting, fixing and regulating the rates to be charged by the power company, as well as the municipal plant, did not consider whether the rate or compensation set would yield more or less than ten per cent net on the actual cost of the physical properties, equipments or betterments, of either the city plant or the defendant company's system, but merely adopted the rates in effect and charged by the power company, with the exception of reducing the minimum to $1.25 and giving a ten per cent discount for prompt payment." This finding

we regard immaterial, as no direct attack was made by appellee on the rates as being insufficient to yield 10 per cent. on the actual cost, etc.; its insistence being that it had the right to charge rates much lower than those prescribed by the city, therefore an objection that the rates prescribed by the ordinance were too low would place appellee in such an incongruous position as to render such criticism unworthy of consideration. In paragraph 14 the court said: "From the evidence I find that if the defendant, the power company, was required to charge the same rates as the municipal plant and as set by the ordinances, that practically all of the customers of the power company would change over to the city plant and become its customers, and that the power company would not have sufficient customers or income to pay the operating expenses of their system in the city without taking into account any reserve for depreciation, and that it would result in a confiscation and loss of their properties and investments in said city." It is obvious that these conclusions are purely speculative, and of course may properly be answered by speculation; however, we do not assent to the doctrine implied that it is the purpose of the law to guarantee economic results, but simply to guarantee to each and all utilities equality of opportunity to compete for local patronage.

The record further discloses that, since the institution of this suit on, to wit, January 1, 1932, in cause No. 694, in equity, pending in the District Court of the United States for the Northern District of Texas, Fort Worth Division, in the case of Stafford-Lowden Company v. Texas Louisiana Power Co., Appellee, receivers were appointed and qualified, with full power to possess, control, and continue the business of appellee, and that all persons were enjoined from instituting or prosecuting or continuing the prosecution of any action at law or proceeding in equity in any court, etc., except by permission of said court; however, it appears that on January 18, 1932, presiding Judge Wilson sustained the motion of appellant herein praying permission to continue the prosecution of the instant suit. The language of the order reads, in part, as follows: "It is considered by the court that said motion should be granted, conditioned, however, that the attorneys for the City of Farmersville should from time to time file certified copies of the orders, decrees or judgments in said state court in this said court, to the end that this court may keep itself advised of the proceedings in the premises, and it is so ordered, adjudged and decreed."

Based upon its findings, the court concluded, as a matter of law, that appellant was not entitled to the injunctive or any other relief prayed for, and that it take nothing by the suit and pay all costs incurred, and,

judgment being entered accordingly, the city of Farmersville appealed.

The case has been ably and thoroughly briefed and argued by both sides, and, while giving due consideration to all questions raised, we pretermit discussion of questions that we do not deem necessary to a proper disposition of the case.

Appellant insists that the trial court erred in holding unconstitutional and void the amendments of article 1119, adopted by the Forty-Second Legislature May, 1931 (see Session Acts, pp. 380, 381), because of a captional defect. The statute was sought to be amended in two respects; that is, the population of the cities and towns authorized to act under said statute was changed from 2,000 to 500, and the concluding paragraph, reading, "the governing body shall not prescribe any rate or compensation which will yield less than ten per cent per annum net on the actual cost of the physical properties, equipments and betterments," was changed so as to read that such governing body shall not prescribe any rate or compensation "which will yield more than 10 per cent. per annum net on the actual costs of the physical properties, equipments and betterments."

The caption of the act (Act 1931, c. 226) reads: "An Act to amend Article 1119 of the Revised Civil Statutes of 1925, so as to change the population of towns coming within its scope from two thousand (2,000) to five hundred (500); and declaring an emergency."

Thus it appears that one of the objects sought was not expressed in the title; that is to say, the change wrought in the last paragraph, wherein a minimum rate of 10 per cent. on actual cost, etc., was changed by the amendment to a maximum rate of 10 per cent. reckoned on the same basis.

Section 35, art. 3, of the Constitution, provides that: "No bill * * * shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so 'expressed."

We assume, for the discussion, that the object expressed in the body of the act, but not expressed in the caption, would, if adopted, constitute a material change in the existing law.

Appellant insists that, as the bill was amended in this respect on the floor of the House, its journal disclosing that, after the amendment was adopted, the House ordered the caption to be amended so as to conform thereto; that the failure to harmonize the caption with the amendment was due to the neglect or oversight of the engrossing officials of the House; therefore the bill should not be held unconstitutional and void in any particular because of such oversight or neglect.

The doctrine is well recognized that, in order to determine the meaning of obscure or doubtful phraseology employed in an act, courts may consider a number of things, among others, the history of the times, the circumstances attending the adoption of the amendment, executive messages to the legislative body, debates, committee reports, and legislative proceedings (25 R. C. L. pp. 1033–1039, §§ 268–271), but this doctrine should not, in our opinion, be extended to the length invoked by appellant. The captional requirement being constitutional, and therefore mandatory, we can only look to the completed act in order to determine its validity in this respect. King v. Terrell (Tex. Civ. App.) 218 S. W. 42 (writ refused). Also see Pangborn v. Young, 32 N. J. Law, 29; Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294. The title of the act under consideration stated a purpose to amend article 1119 only in one respect; that is, so as to authorize cities and towns of over 500 population to exercise the regulatory and rate-making power theretofore granted cities and towns of over 2,000 population; this purpose having been specified in the title, an amendment attempted in another respect cannot, under the authorities, be sustained as a valid enactment. Arnold v. Leonard, 114 Tex. 535, 273 S. W. 799, 803; Chancey v. Dayton, etc., R. Co. (Tex. Civ. App.) 280 S. W. 843; Hamilton v. St. Louis, etc., R. Co., 115 Tex. 455, 283 S. W. 475; Gulf Production Co. v. Garrett, 119 Tex. 72, 24 S.W.(2d) 389.

The contention is also made that the objectionable amendment, being subordinate and an incident to the paramount purpose as disclosed in the title, should be held unobjectionable, under the doctrine quoted from Dillon, announced in Johnson v. Martin, 75 Tex. 33, 12 S. W. 321, 324, discussed in Doeppenschmidt v. International & G. N. R. Co., 100 Tex. 532, 101 S. W. 1080, and Missouri, K. & T. R. Co. v. State of Texas, 102 Tex. 153, 113 S. W. 916, as follows: "This provision [of the Constitution] has been frequently construed to require only the general or ultimate object to be stated in the title, and not the details by which the object is to be attained. Any provision calculated to carry the declared object into effect is unobjectionable, although not specially indicated in the title." We cannot accept this view. The rate matter dealt with was not, in our opinion, an incident to, or a detail of, the expressed purpose "to change the population of towns coming within its scope from two thousand (2,000) to five hundred (500)"; these constituted two distinct objects, one expressed in the title, the other not.

Appellant contends further that, if the second sentence of the amending statute, dealing with the rate subject, is held objectionable for the reason stated, it would follow that the original rate provision of the statute, before the amendment was attempted, survives nevertheless; therefore that the first sentence of the amended article, dealing with the subject of population, and the second sentence of the original article, dealing with the rate subject, now constitute the law in point.

Our attention is called to the decision of the Supreme Court, in Ward, etc., Co. v. Carpenter, 109 Tex. 103, 200 S. W. 521, in support of this contention. This case involved an act (Acts 1913, c. 72) amending article 7235, R. S. 1911, a stock law, that applied to a number of counties, including Matagorda. The amendment proposed, as expressed in the title, was to include certain other counties, naming them, and the article in this respect was amended. However, Matagorda county was neither mentioned in the title of the amending statute nor in the body of the completed bill. In this situation, the contention was made that, having been dropped from the statute, Matagorda county could not avail itself of the privileges of the stock law. The Supreme Court denied this contention, holding that the title of the amending act expressed only one purpose, that is, to extend the application of the statute to certain counties other than those named in the original act, and that the exclusion of Matagorda county from the list of counties to which the amendatory act applied was beyond the purpose to which the amendatory act was expressly limited by its title, and to that extent was unconstitutional and void. The following cases are to the same effect: Chapman v. Morrison (Tex. Civ. App.) 278 S. W. 236; Hofheinz v. Wilson (Tex. Civ. App.) 281 S. W. 273; Rodgers v. Tobias (Tex. Civ. App.) 225 S. W. 804.

We find no material distinction between the question presented in the Ward-Carpenter Case and the question presented in the case at bar; therefore hold that the amendment to article 1119 was ineffective to change the existing provision in second paragraph with reference to rates, but that it was effective to change the original statute in the other respect; therefore hold that the amendment bringing cities of over 500 population within the scope of the article and the unchanged rate provision of paragraph 2 of the article as it read before the amendment was attempted constitute the valid statutory provisions in point.

However, if in error in this, we think the amended act should be sustained on another theory which we will now discuss. If it be true that the attempted amendment to article 1119, relating to rates, was improperly adopted because of the captional defect, would that nullify the entire act? We think not; at most, the amendment would fail only as to the purpose not expressed in the title. This proposition, we believe, may be sustained under the terms of the Constitution reading,

"but if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed." The purpose expressed in the title relating to the change in population of cities to be brought within the scope of the statute is an object entirely separate and distinct from the other object attempted, is complete within itself, clearly evidencing a legislative intent, and may stand without any reference to the unauthorized portion of the amendment. This idea is seemingly sustained by the Supreme Court in Western Union Tel. Co. v. State, 62 Tex. 630. The court said: "It does not necessarily follow, because a statute is void in part that it is void in toto; for some of its provisions, not liable to any constitutional objection, may be separate and distinct from the parts which are void, and so complete within themselves, and so clearly evidencing the legislative intention in reference to the subjects to which they relate that they may stand without reference to the parts which are void." To the same effect, see Arnold v. Leonard, 114 Tex. 535, 273 S. W. 799; Young v. Chilton (Tex. Civ. App.) 41 S.W.(2d) 505.

The doctrine announced in 36 Cyc. par. 10, p. 1165, quoted, with approval, by the Commission of Appeals in American Surety Co. v. Axtell Co., 120 Tex. 166, 36 S.W.(2d) 715, 719, and approved by the Supreme Court, is that "An amended act is ordinarily to be construed as if the original statute had been repealed, and a new and independent act in the amended form had been adopted in its stead; or, as frequently stated by the courts, so far as regards any action after the adoption of the amendment, as if the statute had been originally enacted in its amended form." Under this doctrine, if the amending act is construed as repealing the original statute, it follows that the amending act, minus the second paragraph dealing with the subject of rates, is the statutory law in point.

██ However, in determining the question under consideration, we do not deem it of any consequence whether the original rate provision of article 1119 is still the law or was impliedly repealed by the amending act, because appellee is in no position to contend that the rates prescribed by appellant are confiscatory or insufficient to yield 10 per cent. per annum net on the actual cost of physical properties, etc.; in fact its position (in our opinion erroneously sustained by the trial court) is revealed in the court's fourteenth conclusion of fact, as follows: "(14) From the evidence I find that if the defendant, the power company, was required to charge the same. rates as the municipal plant and as set by the ordinances, that practically all of the customers of the power company would change over to the city plant and become its customers, and that the power company would not have sufficient customers or income to pay the operating expenses of their system in the city without taking into account any reserve for depreciation, and that it would result in a confiscation and loss of their properties and investments in said city."

The loss of patrons by appellee (visualized by the trial court), if compelled to charge the same rates prescribed by the municipal plant for its own observance, which, until overturned in an appropriate proceeding, are presumed reasonable, and such as appellant was compelled to impose in order to discharge its duty under article 1113, R. S., is obviously based upon speculation; but even if, as assumed by the court, patrons should change from appellee to appellant as the result of competition based alone upon the quality of service rendered, which would be the case, as the record neither discloses nor is it contended that there existed any inequality in *opportunity to secure business;* loss of patronage, under these circumstances, would be simply an incident to legitimate competition, an economic loss, and in no sense a confiscation of appellee's property as that term is understood. Can it be reasonably insisted that appellee will suffer a confiscation of property if compelled to charge rates materially higher than those being voluntarily collected by it? Its position, in effect, is that, in order to prevent confiscation, under the ministry of higher rates, it was selling its service for materially less compensation. It is perfectly obvious that, if appellee is compelled to charge the rates prescribed by the ordinance, it will suffer loss only in so far as it fails to successfully compete with the municipal plant in the quality of service rendered under precisely equal conditions and opportunities.

The law guarantees equal opportunities for competition, but does not and cannot guarantee economic results. This doctrine was announced by the United States Supreme Court in Ætna Insurance Co. v. Hyde, 275 U. S. 440, 48 S. Ct. 174, 177, 72 L. Ed. 357, as follows: "It has never been and cannot reasonably be held that state-made rates violate the Fourteenth Amendment merely because the aggregate collections are not sufficient to yield a reasonable profit or just compensation to all companies that happen to be engaged in the affected business." The same idea was expressed by Judge Hutcheson in Galveston Electric Co. v. City of Galveston (D. C.) 272 F. 147, 162. He wrote: "Counsel on page 47 of their brief say: 'It must be borne in mind in this connection, that the Galveston Electric Company is a public service corporation, and that the Constitution guarantees it a fair return upon the value of its property.' This statement is wholly erroneous, and must have been made without thought. The Constitution makes no guarantee to the complainant, except to protect it against legislation which would deprive the

company of the right to charge rates adequate to produce a fair rate of return. If counsel's major premise that the Constitution guarantees a fixed net for return were correct, its conclusion is right, but that this proposition is unsound is manifest. Certainly the Constitution does no more than to say to the complainant that the Legislature cannot force it to operate at such rates as will deprive it of a return similar to that enjoyed generally by enterprises in that community." If an economic disaster should overtake a public utility as the result of legitimate competition, the loss must be borne as a business casualty. In Hamilton Gaslight, etc., v. City of Hamilton, 146 U. S. 258, 13 S. Ct. 90, 93, 36 L. Ed. 963, Justice Harlan used the following language in point: "It may be that the erection and maintenance of gas works by the city at the public expense, and in competition with the plaintiff, will ultimately impair, if not destroy, the value of the plaintiff's works for the purposes for which they were established. But such considerations cannot control the determination of the legal rights of the parties."

■■ However, the decisive questions presented are these: Was the governing body of Farmersville authorized to enact the ordinance prescribing the rates to be charged consumers by both utilities operating in Farmersville, the privately owned as well as the publicly owned plant, and compel obedience thereto?

Amended article 1119 being a valid enactment, it follows, in our opinion, that appellant, being within its scope, was not only authorized to pass the rate ordinance, but, as held in City of Uvalde v. Uvalde Electric & Ice Co. (Tex. Com. App.) 250 S. W. 140, and in Community Natural Gas Co. v. Natural Gas & Fuel Co. (Tex. Civ. App.) 34 S.W.(2d) 900, 902, 903, it became its duty so to do, and, having performed the duty, it is entitled to a decree compelling obedience by appellee, its agents and servants. The record discloses that in the year 1929 the city of Farmersville established its own electric lighting system, as shown in paragraph 6 of the court's findings, as follows: "During the year 1929 the City of Farmersville, through its governing body, availed itself of the rights accorded cities and towns in this state to purchase and install its own electric light plant. The electric machinery was purchased on time payments under the provisions of the statute of the state, authorizing such purchase and in respect to the purchase, installation and operation of its electric light plant, the city conformed to the provisions of the statutes authorizing and controlling municipal corporations engaged in such business. * * *"

In this situation, the governing body was not only required to prescribe reasonable rates to be charged consumers by the utilities for lighting services, but it was mandatorily directed by statute to charge and collect for such service (its service) "a sufficient rate to pay for all operating, maintenance, depreciation, replacement, betterment and interest charges, and for interest and sinking fund sufficient to pay any bonds issued to purchase, construct or improve any such systems or of any outstanding indebtedness against same. * * *" See article 1113, R. S. 1925. This statute compels the governing body to levy and collect, as a minimum, rates that would yield enough revenue to pay the items above mentioned, or such as were necessary, and the presumption will be indulged that, in the proper exercise of discretion, the governing body faithfully performed this duty, and that the rates prescribed in the ordinance for its own observance, as well as for the observance of appellee, represented the irreducible minimum below which appellant could not go without violating a plain statutory duty; equality of opportunity for business had to be maintained; and, as appellant was compelled by statute to charge a minimum rate sufficient to accomplish the purposes named, and maintain equal competition conditions, it was compelled to prescribe the same minimum rates for observance by itself as well as by appellee. This being true, will appellee be permitted to disregard the schedule by charging and collecting rates materially lower than those fixed by the ordinance? We do not think so, because it is obvious that, if appellee is permitted to disregard the ordinance in this respect, the municipal plant will have a short life, the municipality will thereby lose a means of measuring reasonable rates, and the right to prescribe a minimum rate, its only means of preserving its plant and maintaining competition in the quality of service, will become "a useless potentiality." The city, having the unquestioned statutory right, regardless of the franchise under which appellee operated, to establish and operate its own lighting system, was entitled to enjoy the same opportunity to compete with appellee on basis of quality of service, just as would any privately owned utility under same circumstances. In Fairbanks, Morse & Co. v. Texas Power & Light Co., 32 F.(2d) 693, 695, the Circuit Court of Appeals (Fifth Circuit) through Foster, Judge, had occasion to say: "Under the laws of Texas cities and towns are given authority to build and operate light and water systems. Article 1111, Complete Tex. St. 1928. This is a right that cannot be contracted away. Article 1, § 17, Texas Const.; City of Brenham v. Brenham Water Co., 67 Tex. 542, 4 S. W. 143. It follows that, regardless of its contract with plaintiff, the city of Commerce had the right to erect its own electric light plant at any time the proper officers should see fit to do so. * * *" The right of a city to enter the field of competition was commented upon by Judge Mc-

Kenna in City of Joplin v. Southwest Missouri Light Co., 191 U. S. 150, 24 S. Ct. 43, 44, 48 L. Ed. 127, thus: "The city, it is further urged, could be indifferent to profits, and could tax its competitor to compensate losses. But this is speculation and it may be opposed by speculation, and there are, besides, countervailing considerations. The limitation contended for is upon a governmental agency, and restraints upon that must not be readily implied. The appellee concedes, as we have seen, that it has no exclusive right, and yet contends for a limitation upon the city which might give it (the appellee) a practical monopoly. Others may not seek to compete with it, and if the city cannot, the city is left with a useless potentiality, while the appellee exercises and enjoys a practically exclusive right. There are presumptions, we repeat, against the granting of exclusive rights, and against limitations upon the powers of government."

It is a matter of common knowledge that large organizations are rapidly absorbing the smaller utilities now furnishing citizens of municipalities and communities throughout the country many of the necessities of everyday life; these utilities are capable, if properly controlled, of rendering a valuable service, but, if left unregulated or permitted to destroy competitors by cut-throat competition, the public may become a prey to unrestrained greed and rapacity. As appellee pursued the most effective course possible to destroy and clear the field of competition, it cannot be reasonably said that it reduced rates and undersold appellant in good faith without an intention to put the city plant out of business and of securing a monopoly; these are the natural and inevitable consequences of the cut-throat competition inaugurated by it. The presumption is indulged that a person intends to accomplish the natural consequences of his acts. 22 C. J. (§ 74) 2, p. 143. Even in criminal matters "the intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act." Penal Code, art. 45, also article 1223.

The most effective instrumentalities being suggested by advanced thinkers for the protection of the public against such impositions are municipally owned and operated utility plants, and the minimum rate schedule to insure competition in quality of service. Both methods of protection were resorted to by the city of Farmersville, and it is importuning the courts to "stay up its hands."

In a recent public address, a distinguished statesman, discussing the subject, said: "There are two methods of restoring reasonable rates for electricity and telephones in this State (New York;) * * * One of these methods is to allow and restore competition either by encouraging new companies to enter the field, or by setting up at least a yardstick, more municipally operated companies, especially in the electrical field." A president of one of our largest railroad systems, expressing himself candidly as to the value of the minimum rate as a means of maintaining healthy competition, recently said: "I cannot share your view that the problem of unregulated competition can be met by withdrawing the power of the Interstate Commerce Commission to fix minimum railroad rates and then allowing the railroads to go in and fight the trucks, busses, barges and ships to the death, as they would be obliged to do. That would not be mere competition. It would be ruthless, barbarous, industrial warfare. I have no doubt whatever that it would end in the general bankruptcy of the country's entire distribution machinery. * * * I would think it a distinct step backward to withdraw the principle of minimum rates in application to the railroads. Instead, I think one of the things chiefly needed is to apply the same principle, through regulative authority, to highway and waterway transportation." What is true in the realm of transportation is equally true in the realm occupied by the utilities. Unrestricted or cut-throat competition is intended to, and will, if pursued to the bitter end, inevitably result in the creation of monopoly. Justice Brandeis, speaking before a House Committee in January, 1913, uttered these words: "Unrestricted competition, with its abuses and excesses, leads to monopoly, because these abuses and excesses prevent competition from functioning properly as a regulator of business. Competition proper is beneficent, because it acts as an incentive to the securing of better quality or lower cost. It operates also as a repressive of greed, keeping within bounds the natural inclination to exact the largest profit obtainable. Unfair and oppressive competition defeats those purposes. It prevents the natural development which should attend rivalry, and which gives success to those who contribute most to the community by their development of their own business and the exercise of moderation in the exaction of profits. It substitutes devious and corrupt methods for honest rivalry, and seeks to win, not by superior methods, but by force. Its purpose is not to excel, but to destroy. The Clayton Act (38 Stat. U. S. 730) and the Federal Trade Commission Act (15 USCA §§ 41–51) are designed to aid in preventing monopoly by preventing unfair and destructive competition, and the worst form of illegitimate competition has been found to be price-cutting. All the investigations in Congress and elsewhere have confirmed this conclusion. Monopoly is a natural outcome of cut-throat competition. With the exception of the railroad rebate, cut-throat competition was the most powerful of all weapons which the Standard Oil Company employed. It was the

most powerful of all weapons employed by the Tobacco Trust. The Standard Oil Trust would cut the price in the districts where a competitor established himself, and thus destroy him, meanwhile reimbursing itself for the cut in the region by charging higher prices elsewhere. * * * "

The precise situation with which we are dealing was before the Supreme Court of Iowa in the case of Incorporated Town of Mapleton v. Iowa Public Service Co., 209 Iowa, 400, 228 N. W. 476, 479, 68 A. L. R. 993, the same anomalous situation presented here was present there; that is, the spectacle of a municipality contending for the enforcement of rates higher than those contended for by the privately owned public utility. There it was contended as contended here, that the purpose of the lower rates charged by the utility was to induce additional customers and to prevent being driven from the field of competition by the municipal plant. The fair inference held by the court in that case, as we think is inevitable here, was that the rate cutting indulged in by the private utility would result ultimately in driving the municipal utility from the field of competition. The court said: "If this can be lawfully done, then a municipally owned plant must always be at the mercy of the owner of a privately owned plant, when such owner chooses to inaugurate a rate war and to take a loss therefrom. The exercise or existence of such a power is antagonistic to the whole scheme of public service by utility companies, and is inconsistent with the principle of rate regulation." The same idea was expressed by the Supreme Court of California in Economic Gas Co. v. City of Los Angeles, 168 Cal. 448, 143 P. 717, 718, Ann. Cas. 1916A, 931. The court said: "Respondent insists, however, that the city's power is merely to declare a maximum rate, and that the corporation may do anything it desires in the way of a reduction of price to a general class of consumers. We cannot agree with this contention. One of the purposes of regulation is to exclude favoritism to an individual or a class. If the legislative body of a city might only fix a maximum rate, it might be possible for a corporation to reduce its charges, in some form or another, to a point which would drive a competitor out of business and, after accomplishing that result, to resume the maximum charge permitted by law. It is contended that the city's police power extends only to the protection of the consumer. But 'regulation' involves more than that. It includes the power to prevent ruinous competition among the producers as well as unjust charges to the consumers. Familiar examples of the right of a regulating body to fix rates which may not be exceeded nor rebated are furnished by the controversies which have arisen between the Interstate Commerce Commission and certain transportation companies. The Su-

preme Court of the United States has held that the tariff rates for shipments may not be evaded by any pretext or device." The same court, in Pinney, etc., Co. v. Los Angeles Gas, etc., Co., 168 Cal. 12, 141 P. 620, 621, L. R. A. 1915C, 282, Ann. Cas. 1915D, 471, disposing of a similar question, said: "Appellant asserts, however, that the only reasonable use of the police power in the matter of rate-fixing is to establish the maximum charge which the public utility may make, leaving it open to the public utility by agreement to fix a less charge for an individual consumer. The untenableness of this position, however, must become apparent when a moment's consideration is given to the fact that one of the primary and most important objects to be attained by rate regulation is the prevention of discrimination. It must be quite clear that to hold that the rate-fixing power goes no farther than to name an amount beyond which a charge may not be made leaves the utmost room for abuse by way of favoritism and discrimination within that limit. It is, in practical effect, a denial of the existence of the rate-fixing power itself." To the same effect, holding that the power to fix a rate implies the power to make it both the maximum and minimum, see Community Natural Gas Co. v. Natural Gas & Fuel Co. (Tex. Civ. App.) 34 S.W.(2d) 900, 902; City of Tipton v. Tipton, etc., Co., 176 Iowa, 224, 157 N. W. 844, 845; concurring opinion of Judge Sawtell in Great Northern Utilities Co. v. Public Service Commission (D. C.) 52 F.(2d) 802, 805, 808.

We are of opinion therefore, and hold, that it is the plain legal duty of appellee to obey, in all things, the rate ordinance in question, and to charge and collect from its patrons in the city of Farmersville no lower rates than those fixed by said governing body, and to this end appellant is entitled to the writ of mandamus commanding appellee, its officers, agents, and servants to perform this legal duty.

■ Without reference to the validity of amended article 1119, we are also of opinion that the rate-cutting enterprise inaugurated and persisted in by appellee is against the public policy of this state, as reflected both by statutory enactments and constitutional provisions, in that the same is inimicable to the maintenance of legitimate competition in the field of service, and is necessarily destructive of the municipally owned and operated utilities, the means by which, if necessary, a municipality may supply needed competition; that the conduct of appellee in the premises is unwarranted, constitutes an invasion of the rights of appellant, entitling it to the equitable relief sought; therefore the writ of injunction will issue restraining appellee, its officers, servants, or agents from charging, exacting, or collecting any rates lower than those fixed by the governing

body for its own observance in the operation of the municipal plant.

Counsel for appellant argues ably and with great plausibility the proposition that, regardless of the validity, vel non, of either the amended or the original article 1119, R. S., the trial court erred in holding the rate ordinances invalid, in that appellant possessed the implied, if not express, power to enact the same, per force of the regulatory powers conferred by article 1011, R. S.; however, in view of our holdings on the other propositions, we leave that question undecided.

In view of the pending receivership, hereinbefore mentioned, no process will issue on the judgment here rendered, so long as said receivership is open, except as and when authorized by the honorable District Court of the United States for the Northern District of Texas (Fort Worth Division), and the attorneys representing appellant should, in compliance with the order of said court, file therein certified copies of all final orders, decrees, and judgments rendered herein.

In harmony with these views, the judgment of the trial court is reversed, and judgment is here rendered for appellant.

Reversed and rendered.

### On Motion for Rehearing.

Owing to the newness and importance of the questions involved, the discussion, first and last, has covered a wide range; however, on the assumption that amended article 1119 is valid, we believe the previous questions may be stated thus: (1) Was the city of Farmersville authorized, in the exercise of the rate-making power delegated by said statute, to enact the minimum rate ordinance in question, and is it entitled to the writ of mandamus compelling obedience thereto? (2) In view of the public policy antagonistic to monopolies, as declared in the Constitution and various statutes of the state, in view of the policy that fosters municipal ownership of utilities, as a means of preventing or combating monopolies, and in view of the rate cutting indulged in by appellee, which, unchecked, will result ultimately in the destruction of appellant's plant and the establishment of a monopoly favorable to appellee, under these circumstances, was appellant justified, without regard to the validity whether or not of the ordinance as a rate regulation, in prescribing minimum rates as a preventive measure, and is it, in the situation described, entitled to the equitable relief sought?

Our affirmative answers to these questions will be found in the original opinion, to all of which we adhere.

Counsel for appellee insist that we erred in restating the amended statute, that is, in retaining the valid and rejecting the invalid portions, because, as restated, the statute does not truly represent legislative intent, in that the Legislature would not have amended the article as to population, without also making the indicated change in the rate provision.

On original submission we gave due consideration to this phase of the subject, but did not discuss it in the opinion. The adjudicated cases shed but little light as each decision turned largely upon its peculiar facts. The governing principle, we think, was correctly stated by Justice Depue for the New Jersey Supreme Court, in Johnson v. State, 59 N. J. Law, 535, 37 A. 949, 950, 39 A. 646, 38 L. R. A. 373, as follows: "It is undoubtedly elementary law that the same statute may be in part constitutional and in part unconstitutional, and, if the parts are wholly independent of each other, that which is constitutional may stand, and that which is unconstitutional will be rejected; but if the different parts of the act are so intimately connected with and dependent upon each other as to warrant a belief that the legislature intended them as a whole, and that if all could not be carried into effect the legislature would not have passed the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent upon each other must fail."

In reaching a decision of the questions, we may consider, among other things, the history of the act. Acts 1931, c. 226. As introduced, the bill (H. B. No. 798) indicated but one purpose; that is, to amend the statute by changing the population of towns within its scope from 2,000 to 1,000. In this form it was reported favorably by the committee in charge, but, on a second reading in the House, was amended on the floor in two respects, one by changing the figures 1,000 to 500, wherever they appeared in the bill, thus clothing a larger number of towns with regulatory and rate-making powers, and by striking out the word "less" and inserting the words "not more," thus changing the minimum rate provision of the statute to a maximum rate provision, and as amended the bill was engrossed and finally passed by both Houses.

The emergency clause also sheds light upon the inquiry. It reads in part: "The fact that towns of populations ranging between five hundred (500) and two thousand (2000) are confronted with the same problems as towns of larger populations, creates an emergency, etc." Thus it appears that the caption and emergency clause are entirely harmonious, expressing but the one object sought; that is, to amend the statute, so as to bring within its scope all towns having in excess of 500 population. Why was this deemed necessary? The emergency clause answers; because all these towns "are confronted with the same problems as towns of larger populations." The parts of the act, that is, the part relating to population, and the rate provision, being independent and separable, no reason

existed, in our opinion, why the Legislature should have made the amendment as to population dependent upon the change in the rate provision.

In the original opinion, we stated in effect that appellee was not permitted to charge and collect for its service in Farmersville any other, either higher or lower, rates than those fixed by the ordinance. This statement is broader than should have been made, as the ordinance authorizes the collection of higher but not lower rates than the minimum prescribed.; therefore the opinion will be corrected, to conform to the idea that, while appellee may charge higher, it is not permitted to charge lower, rates than the minimum fixed by the ordinance adopted by the governing body of appellant.

In an addendum to its motion for rehearing, appellee requests additional findings in keeping with and embracing the facts found by the trial court, in paragraphs 7 and 11 of its findings. While we do not deem these material, yet appellee does and is entitled to same, as follows: "(7) The public square of the City of Farmersville is 99 feet wide by 400 feet long, with business houses, approximately forty, located around same and upon streets, leading in various directions therefrom. Upon the commencement of operations of the municipal plant the city agreed with the owners of business houses that if they would pay for and install 25 watt globes along under the awnings in front of their places of business from a foot eighteen inches back from the front of the awning and wire the same, that the city would furnish these customers with free electricity to light up the lights under the awnings, if they would become customers of the city's municipal plant, and various business men availed themselves of this opportunity, until at this time there are between fifty and sixty business customers of the city plant enjoying the privilege, while the power company had only six or seven business customers, but free current was not and is not furnished now to the business houses who are customers of the power company." "(11) That the municipal plant, since shortly after it commenced operations, has had two hundred and seventy-five (275) customers, or more, and their income has been sufficient to pay all operating expenses, and produce a net income of more than sufficient to pay off and discharge the monthly payments due upon the purchase price of the municipal plant, and some payments have been paid prior to their due date. That the power company has had approximately 285 customers and their income has been sufficient to pay their operating expenses and create some small surplus."

After due consideration, the motion of appellee for rehearing is overruled, and its request for additional findings is granted.